Dwight J. LOVING, Private,
U.S. Army, Appellant,

v.

William L. HART, Colonel, Commandant,
United States Disciplinary Barracks;
and The United States, Appellees.

No. 96–8022.
Crim.App. No. 9601437.

U.S. Court of Appeals for
the Armed Forces.

Argued Dec. 17, 1996.

Decided Feb. 26, 1998.

Sullivan, J., filed opinion concurring in part and in the result.

Effron, J., filed opinion concurring in part and dissenting in part.

For Appellant: *John H. Blume* (argued); *Teresa L. Norris.*

For Appellee: *Major Lyle D. Jentzer* (argued); *Colonel John Smith* and *Lieutenant Colonel Eva M. Novak.*

### Opinion of the Court

GIERKE, Judge:

A general court-martial convicted appellant, contrary to his pleas, of premeditated murder, felony murder, attempted murder, and robbery (5 specifications), in violation of Articles 118, 80, and 122, Uniform Code of Military Justice, 10 USC §§ 918, 880, and 922, respectively. The court-martial sentenced appellant to a dishonorable discharge, total forfeitures, and to be put to death. On direct appeal appellant raised 70 issues. After specifically addressing each issue, our Court affirmed the decision of the Court of Military Review,[1] which had affirmed the findings and sentence. 41 MJ 213, 229 (1994), *modified on reconsideration,* 42 MJ 109 (1995). The Supreme Court affirmed our decision. 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996).

After the Supreme Court's decision, appellant filed a petition for extraordinary relief in the nature of a writ of mandamus with the Court of Criminal Appeals, electing to raise only one issue: that he was entitled to extraordinary relief because his death sentence was based in part on a conviction of felony murder that was unsupported by a unanimous finding of intent to kill or reckless

indifference to human life. The Court of Criminal Appeals summarily denied relief in an unpublished order dated September 9, 1996. Appellant then filed a writ-appeal petition with this Court, which we granted on November 5, 1996, and set the petition for oral argument. For the reasons set out below, we affirm the decision of the Court of Criminal Appeals denying the petition for extraordinary relief.

At appellant's court-martial the members unanimously found that the following three aggravating factors were proved beyond a reasonable doubt:

1. . . . The premeditated murder of Bobby Gene Sharbino was committed while the accused was engaged in the commission or attempted commission of a robbery.

2. . . . Having been found guilty of the felony murder of Christopher Fay as set forth in specification 3 of Charge I, the accused was the actual perpetrator of the killing.

3. . . . Having been found guilty of premeditated murder of Bobby Gene Sharbino, the accused was also found guilty of another violation of Article 118, UCMJ, in the same case.

41 MJ at 301. In accordance with RCM 1004(b)(4)(C), Manual for Courts–Martial, United States (1995 ed.),[2] the members also unanimously found that "any extenuating and mitigating circumstances" were "substantially outweighed by any aggravating circumstances." 41 MJ at 302.

In our direct review of this case, we agreed with the Court of Military Review's conclusion that the number of aggravating factors did not affect the decision of the court-martial to impose the death sentence. 41 MJ at 268.

During oral argument before the Supreme Court, Justice Scalia questioned the constitutional validity of Article 118(4) because it is punishable by death but does not require an intent to kill. Tr. Oral Arg. at 8–14. In its decision, the Supreme Court said:

---

**1.** *See* 41 MJ 213, 229 n. * (1994).

**2.** This version of the rule was in effect at the time

of the offense in 1988.

Article 118(4) by its terms permits death to be imposed for felony murder even if the accused had no intent to kill and even if he did not do the killing himself. The Eighth Amendment does not permit the death penalty to be imposed in those circumstances. *Enmund v. Florida*, 458 U.S. 782, 801, 102 S.Ct. 3368, 3378–3379, 73 L.Ed.2d 1140 (1982). As a result, additional aggravating factors establishing a higher culpability are necessary to save Article 118.

517 U.S. at 756, 116 S.Ct. at 1742.

Appellant now argues that felony murder under Article 118(4) is constitutionally infirm as a capital offense because it does not require an intent to kill. He argues further that the second aggravating factor—that he was the actual perpetrator of the killing in the felony murder of Mr. Fay—is constitutionally defective, because it is unsupported by a unanimous finding of intent to kill or reckless indifference to the value of human life. He argues that the errors were prejudicial because the court members were told that there were two death-eligible offenses when in fact there was only one and that there were three aggravating factors when there were only two. Defense Reply at 8. Appellant asks our Court for "a writ of habeas corpus or other appropriate extraordinary relief setting aside the death penalty ... and ordering" a sentencing rehearing. Writ–Appeal Petition at 5.

■ This Court has jurisdiction to act on appellant's petition for extraordinary relief and to issue a writ under the All Writs Act, 28 USC § 1651(a). *See Noyd v. Bond*, 395 U.S. 683, 695 n. 7, 89 S.Ct. 1876, 1883 n. 7, 23 L.Ed.2d 631 (1969); *Dettinger v. United States*, 7 MJ 216 (1979); *United States v. Frischholz*, 16 USCMA 150, 152, 36 CMR 306, 308 (1966).

The aggravating factor at issue in appellant's case is the so-called "triggerman" factor. The version in effect at the time of appellant's trial read as follows: "That only in the case of a violation of Article 118(4), the accused was the actual perpetrator of the

killing." RCM 1004(c)(8), Manual for Courts–Martial, United States, 1984 (Change 2, 1986).[3] The members specifically found that appellant was the "actual perpetrator of the killing." 41 MJ at 301.

■ When analyzing an appellant's assertion that an aggravating factor is invalid, "it is essential to keep in mind the sense in which ... [it] is 'invalid.'" *Zant v. Stephens*, 462 U.S. 862, 885, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983). Some Supreme Court decisions on "invalid" aggravating factors involve procedural or evidentiary errors resulting in erroneous admission of aggravating evidence or exclusion of mitigating evidence. *See, e.g., Tuggle v. Netherland*, 516 U.S. 10, 116 S.Ct. 283, 133 L.Ed.2d 251 (1995) (defendant erroneously denied expert assistance to rebut psychiatric evidence of future dangerousness). In this writ appeal appellant does not assert that inadmissible evidence was considered on sentencing or that mitigating evidence was erroneously excluded.

Some Supreme Court cases involve aggravating factors that are too vague. *See, e.g., Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) ("especially heinous, atrocious, or cruel" aggravating circumstance too vague). Appellant does not assert that the "actual perpetrator" factor is too vague.

Instead, appellant asserts that the term, "actual perpetrator of the killing," is too broad and thus fails to "genuinely narrow the class of persons eligible for the death penalty." Writ–Appeal Petition at 7, 12; *see Zant*, 462 U.S. at 877, 103 S.Ct. at 2742; *see also Godfrey v. Georgia*, 446 U.S. 420, 428–29, 100 S.Ct. 1759, 1764–65, 64 L.Ed.2d 398 (1980) (phrase "outrageously or wantonly vile, horrible or inhuman" too broad "because a person of ordinary sensibility could find that almost every murder fit the stated criteria"). Quoting the Ninth Circuit in *United States v. Cheely*, 36 F.3d 1439, 1443 n. 9 (1994), he argues that "[t]he least culpable mental state the Supreme Court has held death-eligible is reckless indifference to human life during

---

**3.** Except for references to RCM 1004(c)(8), all references to RCMs are to the 1995 edition of the

Manual for Courts–Martial, which contains the version in effect at the time of the offenses.

commission of a felony." Writ–Appeal Petition at 8.

■ In assessing the impact of a factor alleged to be invalid, it is necessary to determine where in the sentencing process the alleged error occurred. We recognized in our direct review of this case that the various jurisdictions where capital punishment is authorized fall into two general categories: "weighing" and "nonweighing" jurisdictions. We explained:

> A "weighing" state balances extenuating and mitigating circumstances against statutory aggravating factors. A "nonweighing" state requires that a statutory aggravating factor be found in order to adjudge a death sentence, but does not require that it be weighed against extenuating and mitigating circumstances.

41 MJ at 248 (RCM 1004 combines procedures of weighing and nonweighing jurisdictions).

The military capital sentencing procedure set out in RCM 1004 and 1006 establishes four "gates" to narrow the class of death-eligible offenders. The first two gates parallel nonweighing jurisdictions in that the members must convict by unanimous vote (RCM 1004(a)(2)) and then find at least one aggravating factor by unanimous vote (RCM 1004(b)(4)(A)). Only after these two gates are passed does the weighing process begin. The third gate is a "weighing" gate, where the members must all "concur" that extenuating and "mitigating circumstances are substantially outweighed by any aggravating circumstances," including the aggravating factors under RCM 1004(c). *See* RCM 1004(b)(4)(C). Only after these three gates are passed does an accused become "death eligible."

The fourth and final gate is the sentencing decision itself under RCM 1006. Even if all members concur that extenuating and mitigating circumstances are substantially outweighed by aggravating circumstances, they must separately consider whether to impose the death sentence. A death sentence requires the unanimous vote of all members. RCM 1006(d)(4)(A).

■ The pivotal issue in this case is whether there was any error at the second gate, in connection with the court-martial's finding with respect to the second aggravating factor: that appellant was "the actual perpetrator of the killing." Accordingly, we first consider whether there was any error at this gate and then evaluate whether any error tainted the death sentence.

■ Several general principles guide us in determining whether capital sentencing procedures pass constitutional muster. First, sentencing standards "must genuinely narrow the class of persons eligible for the death penalty." Second, the standards "must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant*, 462 U.S. at 877, 103 S.Ct. at 2742; *see also Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 2635, 129 L.Ed.2d 750 (1994); *Arave v. Creech*, 507 U.S. 463, 474, 113 S.Ct. 1534, 1542, 123 L.Ed.2d 188 (1993). Third, the standards must provide "reliability in the determination that death is the appropriate punishment." *Zant, supra* at 884–85, 103 S.Ct. at 2747. Finally, in order to ensure reliability, the process must "make rationally reviewable the process for imposing a sentence of death." *Tuilaepa, supra* at 973, 114 S.Ct. at 2635, quoting *Arave*, 507 U.S. at 471, 113 S.Ct. at 1540. In most cases, the requirement that the process be "rationally reviewable" is satisfied by requiring specific answers to questions "with a factual nexus to the crime or the defendant." 512 U.S. at 973, 114 S.Ct. at 2635.

*Stringer v. Black*, 503 U.S. 222, 232, 112 S.Ct. 1130, 1137, 117 L.Ed.2d 367 (1992), held that when the weighing process is "skewed" by consideration of an invalid factor, "only constitutional harmless-error analysis or reweighing at the trial or appellate level suffices to guarantee that the defendant received an individualized sentence."

*Clemons v. Mississippi*, 494 U.S. 738, 754, 110 S.Ct. 1441, 1451, 108 L.Ed.2d 725 (1990), held that appellate reweighing or harmless-error analysis is constitutionally permissible, unless "peculiarities in a case make appellate reweighing or harmless-error analysis ex-

tremely speculative or impossible." Although *Clemons* held that appellate reweighing is constitutionally permissible, whether a specific appellate court has authority to reweigh is determined by the law of the jurisdiction. After *Clemons* was remanded to the Mississippi Supreme Court, that court decided that it did not have authority to reweigh. 593 So.2d 1004 (1992); *see also Reeves v. Hopkins,* 871 F.Supp. 1182, 1195 (D.Neb. 1994) (appellate resentencing constitutionally permitted but may be done only if state law permits it), *rev'd in part,* 76 F.3d 1424, 1427 (8th Cir.1996).

*Enmund,* 458 U.S. at 796–97, 102 S.Ct. at 3376–77, held that the Eighth Amendment was violated by imposition of the death penalty on a person who aided and abetted a felony murder by driving the getaway car in a robbery, but who did not himself kill or intend to kill. *Enmund* held that a death sentence under those circumstances was excessive and disproportionate.

*Tison v. Arizona,* 481 U.S. 137, 158, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987), held that the culpability requirement imposed by *Enmund* could be satisfied by "major participation in the felony committed, combined with reckless indifference to human life." In *Tison* the trial court had specifically found that the defendant's participation in the felony murder was "substantial" but made no specific finding that the defendant exhibited reckless indifference to human life. The Supreme Court remanded the case for a specific finding of the latter.

Justice O'Connor, writing for the five Justices in the *Tison* majority, placed *Enmund* at the low end of the spectrum of culpability. 481 U.S. at 149, 107 S.Ct. at 1683–84. Justice O'Connor observed that the Court in *Enmund* also "dealt with the other polar case: the felony murderer who actually killed, attempted to kill, or intended to kill." She stated that the Court in *Enmund* "clearly held that the equally small number of jurisdictions that limited the death penalty to these circumstances [actually killed, attempted to kill, or intended to kill] could continue to exact it." 481 U.S. at 150, 107 S.Ct. at

1684. Notwithstanding Justice O'Connor's description of the *Enmund* holding, the Court's holding in *Tison* is limited to the question whether "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." The Court declined "to precisely delineate the particular types of conduct and states of mind warranting imposition of the death penalty here." 481 U.S. at 158, 107 S.Ct. at 1688.

Neither *Enmund* nor *Tison* involved an actual killer. Thus, left unanswered after *Enmund* and *Tison* is the question whether a person who "actually killed" may be sentenced to death absent a finding that the person intended to kill. As highlighted by Justice Scalia in the *Loving* oral argument, the phrase "actually killed" could include an accused who accidentally killed someone during commission of a felony, unless the term is limited to situations where the accused intended to kill or acted with reckless indifference to human life. We note that Justice White, who wrote the majority opinion in *Enmund* and joined the majority opinion in *Tison,* had earlier written separately in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), expressing his view that "it violates the Eighth Amendment to impose the penalty of death without a finding that the defendant possessed a purpose to cause the death of the victim." 438 U.S. at 624, 98 S.Ct. at 2983. Without speculating on the views of the current membership of the Supreme Court, we conclude that when *Enmund* and *Tison* were decided, a majority of the Supreme Court was unwilling to affirm a death sentence for felony murder unless it was supported by a finding of culpability based on an intentional killing or substantial participation in a felony combined with reckless indifference to human life. Thus, we conclude that the phrase, "actually killed," as used in *Enmund* and *Tison,* must be construed to mean a person who intentionally kills, or substantially participates in a felony and exhibits reckless indifference to human life.

The version of RCM 1004(c)(8) in effect at the time of trial contained the phrase, "actual perpetrator of the killing." According to the 1991 amendment to the Drafters' Analysis of this Rule, it was based on the Supreme Court's holding in *Enmund*. *See* Manual, *supra* (1995 ed.) at A21–73. RCM 1004(c)(8) had been amended in 1991, after appellant's trial, to cover persons other than the one who "actually killed" and to incorporate the Supreme Court's decision in *Tison*. Drafters' Analysis, *supra*.

The requirement of *Zant*, 462 U.S. at 877, 103 S.Ct. at 2742, to "genuinely narrow the class of persons eligible for the death penalty" is met in felony-murder cases only if there is a rational connection between the level of culpability and the narrowing process. In short, only the most culpable should be death eligible. When Congress enacted Article 118, it made a legislative determination that only premeditated murder under Article 118(1) and felony-murder under Article 118(4) are punishable by death. However, unpremeditated murder under Article 118(2), which includes intentional killings, is not punishable by death. Thus, unless we interpret Article 118(4) to apply only to cases involving intentional killing or reckless indifference to human life, we create the anomaly of the accidental killer being death eligible under Article 118(4) but the intentional killer not being death eligible under Article 118(2). This interpretation would allow the death penalty for the person who unintentionally kills by firing through the ceiling during a robbery in an effort to scare the victim or someone whose intended victim dies of a heart attack during a robbery, but it would not permit the death penalty for a person who, without premeditation, intentionally kills. We believe that such an interpretation of Article 118 and the aggravating factors under RCM 1004 would violate *Zant's* requirement that the aggravating factor "reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." 462 U.S. at 877, 103 S.Ct. at 2742.

Based on the foregoing analysis, we conclude that felony-murder under Article 118(4) can pass constitutional muster as a capital offense only if it is combined with an aggravating factor sufficient to satisfy the narrowing requirement of *Zant v. Stephens, supra,* and culpability requirements of *Enmund* and *Tison*. Although *Enmund* and *Tison* were decided on the basis of proportionality and did not decide the validity of an aggravating factor, the culpability requirement is part and parcel of the narrowing process required by *Zant* in felony-murder cases.

■ In *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), a plurality of the Supreme Court suggested that an otherwise overly broad aggravating factor can be made constitutionally acceptable if state courts apply a constitutionally sufficient interpretation and narrow the factor by appropriate jury instructions. *Id.* at 429–32, 100 S.Ct. at 1765–67. An aggravating factor passes the constitutional-vagueness test "if it has some 'common-sense' core of meaning ... that criminal juries should be capable of understanding.'" *Tuilaepa,* 512 U.S. at 973, 114 S.Ct. at 2636. Thus, we hold that the aggravating factor in RCM 1004(c)(8)—that appellant was the "actual perpetrator of the killing"—is constitutionally valid on its face, provided that it is understood to be limited to a person who kills intentionally or acts with reckless indifference to human life.

In appellant's case the court members unanimously found that appellant was the "actual perpetrator of the killing." For the reasons set out below, we are satisfied that in this case the court members understood the term to mean an intentional killing.

■ The issue is before us in this case because the military judge did not define the term "actual perpetrator of the killing." Defense counsel did not request that he do so or object to the lack of definition. Thus, we must determine whether there was a deficiency in the military judge's instructions that undermines the validity of the finding that appellant was the "actual perpetrator of the killing." We hold that the military judge's failure to define the term was not

error under the particular facts of this case.[4]

Neither the aggravating factors nor the *Enmund/Tison* culpability requirement are elements of the offense. *See Walton v. Arizona,* 497 U.S. 639, 648–49, 110 S.Ct. 3047, 3054–55, 111 L.Ed.2d 511 (1990). Thus, definition of the term, "actual perpetrator of the killing," was not a required instruction unless it was "necessary" under RCM 920(e)(7), which requires "[s]uch other explanations, descriptions, or directions as may be necessary and which are properly requested by a party or which the military judge determines, sua sponte, should be given." Under RCM 920(f), "[f]ailure to object ... to omission of an instruction ... constitutes waiver ... in the absence of plain error." We need not decide whether waiver or plain error applies to this case, because we hold that the military judge's failure to define "actual perpetrator of the killing" was not error under the particular facts of this case.

The overwhelming and uncontested evidence established that appellant, acting alone, personally and intentionally killed Mr. Fay. The defense did not assert that appellant shot Mr. Fay accidentally or unintentionally. The Court of Military Review described the killing of Mr. Fay as follows:

> After entering the taxicab and after arriving at Fort Hood, appellant directed the driver to park in a dark secluded area behind the barracks. He produced a pistol, held the pistol to the driver's head, ordered the driver to shut off the car's motor and lights, and demanded all the driver's money. After replying "bullshit" to the driver's protests that he had surrendered all of the money, appellant shot the driver in the back of the head. While looking at the hole in the back of the victim's head and the blood "gushing out," appellant cocked the pistol and shot him in the back of the head again.

34 MJ at 959. In our direct review of this case, we described the facts similarly:

> After receiving an unknown amount of money from Fay, appellant shot him in the back of the head. While watching the

blood "gushing out" of the back of Fay's head, appellant shot him in the back of the head a second time.

41 MJ at 229.

Under these facts, there is no reasonable possibility that the court members understood the term "actual perpetrator of the killing" to mean anything other than an intentional killing. A reasonable factfinder at either the trial or appellate level could come to no other conclusion, because there simply was no issue of fact to be resolved. The issue of an accidental or unintentional killing was not raised. Thus, we hold that no clarifying instruction was required. *See United States v. Ferguson,* 15 MJ 12, 19–21 (CMA 1983) (defense of accident not raised by the evidence).

■ Even assuming *arguendo* that an instruction defining "actual perpetrator of the killing" should have been given, we are satisfied that such a deficiency was harmless beyond a reasonable doubt because it could not possibly have affected the court-martial's finding of the aggravating factor. *See People v. Osband,* 13 Cal.4th 622, 55 Cal.Rptr.2d 26, 62, 919 P.2d 640, 678 (Cal.1996) (error in failing to instruct jury that special circumstance includes an intent to kill was "harmless when 'the evidence of defendant's intent to kill ... was overwhelming, and the jury could have had no reasonable doubt on that matter.' "); *State v. Breedlove,* 655 So.2d 74, 76–77 (Fla.1995) (instructional error harmless where "aggravator clearly existed and would have been found even if the requested instruction had been given").

In an appropriate case we could remand to the Court of Criminal Appeals for a specific finding of culpability, as the Supreme Court did in *Tison.* *See Cabana v. Bullock,* 474 U.S. 376, 392, 106 S.Ct. 689, 700, 88 L.Ed.2d 704 (1986) (state appellate court may make culpability finding required by *Enmund* ). In view of the complete absence of any factual issue on this matter, and our conclusion that any instructional deficiency was harm-

---

4. Notwithstanding our holding in this case, we strongly urge military judges in future cases to define the term "actual perpetrator of the killing" to avoid this appellate issue.

less beyond a reasonable doubt, no remand is required.

Finally, assuming *arguendo* that there was a deficiency in the military judge's instructions regarding the "actual-perpetrator" factor, we are satisfied beyond a reasonable doubt that any such deficiency did not affect the sentencing process. The issue with respect to the "actual-perpetrator" factor arose at the second gate of determining "death eligibility," before the weighing process began. When there is a defective aggravating factor in the "nonweighing" phase of the sentencing process, the error does not require reversal where there is at least one other valid aggravating factor. As the Supreme Court held in *Stringer*, 503 U.S. at 232, 112 S.Ct. at 1137: "[S]o long as the sentencing body finds at least one valid aggravating factor, the fact that it also finds an invalid aggravating factor does not infect the formal process of deciding whether death is an appropriate penalty." Because at least one other valid aggravating factor was found in this case, we hold that any instructional deficiency concerning the "actual-perpetrator" factor did not affect the nonweighing phase of the sentencing process.

We turn next to the weighing phase of appellant's sentencing. The Supreme Court set the standard of review in *Stringer v. Black, supra,* as follows:

But when the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale. When the weighing process itself has been skewed, only constitutional harmless-error analysis or reweighing at the trial or appellate level suffices to guarantee that the defendant received an individualized sentence.

503 U.S. at 232, 112 S.Ct. at 1137.

For the reasons set out below, we hold that no appellate reweighing is required because the error was harmless beyond a reasonable doubt. Thus, we do not reach the question whether this Court or a Court of Criminal Appeals has the legal authority to reweigh.

Harmless-error analysis necessarily requires review of the entire record, including examination of the aggravating circumstances (including the aggravating factors) and mitigating circumstances that were presented to the sentencing authority. Even if the court-martial's finding regarding the "actual-perpetrator" factor was defective, appellant's role as the "actual perpetrator of the killing" was properly considered by the members as an aggravating circumstance. *See* RCM 1004(b)(4)(C). In effect, any error resulted only in the triggerman circumstance being mislabeled as a factor, but the facts and circumstances were properly in the balance and were unchanged. Thus, any defect in the court-martial's finding concerning the "actual-perpetrator" factor did not put a "thumb" on "death's side of the scale" because the same facts and circumstances remained on the same sides of the scale. *Stringer, supra* at 232, 112 S.Ct. at 1137–38. While in some circumstances a change of labels may change the weight to be given to evidence, we are satisfied that changing appellant's role as the "actual perpetrator" from a "factor" to a "circumstance" neither adds to nor detracts from its weight. Since the balance of aggravating and mitigating circumstances was unchanged, we are satisfied beyond a reasonable doubt that any error was harmless, because any mislabeling could have had no impact on the court members' decision to impose the death sentence. *See Zant,* 462 U.S. at 888–89, 103 S.Ct. at 2748–49 (mislabeling aggravating circumstance as a "statutory" circumstance had an "inconsequential impact" on sentencing where evidence was otherwise admissible and jury was instructed to consider all facts and circumstances in extenuation, mitigation, and aggravation); *see also Hampton v. Page,* 103 F.3d 1338, 1345 (7th Cir.1997) (mislabeling nonstatutory aggravator as statutory harmless; sentencer "free ... to consider the conduct, regardless of how it was labeled").

Appellant argues, however, that the error is not harmless beyond a reasonable doubt because we cannot be sure that the members were not influenced by the fact that

appellant was being sentenced for two capital offenses instead of one and the presence of three aggravating factors instead of two. For the reasons set out above, we hold that appellant was convicted of a capital felony-murder that satisfies the proportionality requirements of *Enmund* and *Tison.* We further hold that the "actual-perpetrator" factor in RCM 1004(c)(8) is facially valid and was applied in a constitutionally permissible manner in this case. Thus, to the extent that number of offenses and aggravating factors influenced the sentencing decision, we hold that the court members properly considered two capital offenses and three aggravating factors.

██ Finally, even if we assume *arguendo* that there is some deficiency in the findings based on the military judge's failure to define the term, "actual perpetrator of the killing," we are satisfied beyond a reasonable doubt that appellant's sentence was not affected by numerical counting of offenses, factors, or circumstances. *See Loving,* 41 MJ at 268. The only identification of capital offenses occurred during the military judge's procedural instructions for voting on findings. Although special findings were required on the three aggravating factors submitted by the prosecution, the entire emphasis by counsel for both sides during the sentencing proceedings was on the facts and circumstances of the offenses and the background of appellant, not on the number of capital offenses or aggravating factors. Neither counsel made reference to the number of capital offenses or aggravating factors in their sentencing arguments. Although the military judge instructed the members that they must find at least one aggravating factor, the military judge's identification of capital offenses was so minimal that appellant assigned as error on direct review the failure of the military judge to identify which offenses were capital offenses. *See* 41 MJ at 252; *see also Davis v. Executive Director of Department of Corrections,* 100 F.3d 750, 774 (10th Cir.1996) (examines judge's instructions to determine if

number of aggravating factors affected sentence); *White v. Singletary,* 972 F.2d 1218, 1226–27 (11th Cir.1992) (upholding state's harmless-error analysis after two of four aggravating factors held invalid); *Jackson v. State,* 498 So.2d 406, 411 (Fla.1986) (double counting of aggravating factors harmless; "sentencing statute requires a weighing rather than a mere tabulation of factors in aggravation and mitigation"). Accordingly, we are satisfied beyond a reasonable doubt that the number of capital offenses and number of aggravating factors had no impact on the sentencing deliberations and that the mislabeling of the triggerman circumstance as a "factor" was likewise harmless beyond a reasonable doubt.

The decision of the United States Army Court of Criminal Appeals denying the petition for extraordinary relief is affirmed.

Chief Judge COX and Judge CRAWFORD concur.

SULLIVAN, Judge (concurring in part and in the result):

The majority opinion is close to the right path and is walking basically in the right direction in this case. Generally, I agree with that opinion's analysis and conclusion that any error in use of RCM 1004(c)(8), Manual for Courts–Martial, United States, 1984, as an aggravating factor in this case was harmless beyond a reasonable doubt. *Stringer v. Black,* 503 U.S. 222, 232, 112 S.Ct. 1130, 1137, 117 L.Ed.2d 367 (1992); *United States v. Loving,* 41 MJ 213, 268 (1994); but *cf. United States v. Curtis,* 32 MJ 252, 270 (CMA 1991)(remand to lower appellate court to consider effect of invalid aggravating factor); *United States v. McCullah,* 76 F.3d 1087, 1111–12 (10th Cir.1996). Nevertheless, I would also hold that RCM 1004(c)(8) ("actual perpertrator [sic] [1] of the killing") is a valid aggravating factor which permits imposition of the death penalty for felony murder in this case. *Curtis, supra* at 265; *Calhoun v. State,* 297 Md. 563, 468 A.2d 45, 74 (1983).

---

1. The version of this Rule applicable at trial misspells "perpertrator." I will use the correct spelling (perpetrator) in quoting the rule.

## I

### Background

Article 118, Uniform Code of Military Justice, 10 USC § 918, proscribes the crime of murder and delineates those murders which are capital. It stated at the time of appellant's offenses:

#### § 918. Art. 118. Murder

Any person subject to this chapter who, without justification or excuse, unlawfully kills a human being, when he

(1) has a premeditated design to kill;

(2) intends to kill or inflict great bodily harm;

(3) is engaged in an act which is inherently dangerous to others and evinces a wanton disregard of human life; or

(4) is engaged in the perpetration or attempted perpetration of burglary, sodomy, rape, robbery, or aggravated arson;

is guilty of murder, and shall suffer such punishment as a court-martial may direct, *except that if found guilty under clause (1) or (4), he shall suffer death or imprisonment for life as a court-martial may direct.*

(Emphasis added.) Petitioner stands convicted before this Court of two capital violations of this statute: the premeditated murder of Bobby Sharbino (Article 118(1)) and the felony murder of Christopher Fay (Article 118(4)). *See* 41 MJ at 231–32.

In *Loving v. United States,* 517 U.S. 748, 755–56, 116 S.Ct. 1737, 1742, 135 L.Ed.2d 36 (1996), the Supreme Court, relying on *Enmund v. Florida,* 458 U.S. 782, 801, 102 S.Ct. 3368, 3378–79, 73 L.Ed.2d 1140 (1982), held that Article 118, to the extent it delineated capital murder, violated the Eighth Amendment. Justice Kennedy said:

[W]e agree with Loving, on the assumption that *Furman* [*v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) ] applies to this case, that aggravating factors are necessary to the constitutional validity of the military capital-punishment scheme as now enacted. Article 118 authorizes the death penalty for but two of the four types of murder specified: premeditated and felony murder are punishable by death, 10 U.S.C. §§ 918(1), (4), whereas intentional murder without premeditation and murder resulting from wanton and dangerous conduct are not, §§ 918(2), (3). *The statute's selection of the two types of murder for the death penalty, however, does not narrow the death-eligible class in a way consistent with our cases. Article 118(4) by its terms permits death to be imposed for felony murder even if the accused had no intent to kill and even if he did not do the killing himself. The Eighth Amendment does not permit the death penalty to be imposed in those circumstances. Enmund v. Florida,* 458 U.S. 782, 801, 102 S.Ct. 3368, 3378–3379, 73 L.Ed.2d 1140 (1982). As a result, additional aggravating factors establishing a higher culpability are necessary to save Article 118. We turn to the question whether it violated the principle of separation of powers for the President to prescribe the aggravating factors required by the Eighth Amendment.

(Emphasis added.) It further held that the President may constitutionally prescribe the "aggravating factors establishing a higher culpability" necessary to save Article 118, and he did so in RCM 1004(c). 517 U.S. at 756, 116 S.Ct. at 1751.

Appellant's court-martial unanimously found the following Presidential aggravating factors existed in this case:

1.... The premeditated murder of Bobby Gene Sharbino was committed while the accused was engaged in the commission or attempted commission of a robbery.

2.... Having been found guilty of the felony murder of Christopher Fay as set forth in specification 3 of Charge I, the accused was the actual perpetrator of the killing.

3.... Having been found guilty of premeditated murder of Bobby Gene Sharbino, the accused was also found guilty of another violation of Article 118, UCMJ, in the same case.

41 MJ at 301. Our majority opinion in *Loving* pointed out:

These findings as to aggravating factors were consistent with the court-martial's

unanimous findings of guilty as to the pre-meditated murder of Bobby Gene Sharbino (specification 2 of charge I); the felony murder of Bobby Gene Sharbino (specification 4 of charge I), which was later dismissed as multiplicious; and the felony murder of Christopher Fay (specification 3 of Charge I).

*Id.* at 267.

## II

### *Appellant's Argument*

Appellant, before this Court, summarizes his argument on this writ-appeal petition as follows:

It is now clear that Private Dwight J. Loving's death sentence violates the Eighth and Fourteenth Amendments.[2] Because Private Loving was convicted of felony murder pursuant to Uniform Code of Military Justice, Article 118(4), 10 USC § 918(4) (1982) [UCMJ], and because the aggravating circumstance was that Private Loving was the "trigger-man" in that felony murder (Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial [RCM] 1004(c)(7)(B)(2)), his sentence of death is incompatible with the Eighth Amendment requirement that: "a capital-sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Lowenfield v. Phelps,* 484 U.S. 231, 244, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988) (quoting *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983)).

Writ–Appeal Petition at 1.

I can find no provision in the Manual for Courts–Martial, United States, 1984, in effect at the time of appellant's trial,[3] which is designated RCM 1004(c)(7)(B)(2). However, the so-called "triggerman" aggravating factor

which he challenges is found in RCM 1004(c)(8), Manual, *supra.* In pertinent part, RCM 1004 stated at the time of trial:

(c) *Aggravating factors.* Death may be adjudged only if the members find, beyond a reasonable doubt, one or more of the following aggravating factors:

\* \* \*

(7) That, only in the case of a violation of Article 118(*l* ):

(A) The accused was serving a sentence of confinement for 30 years or more or for life at the time of the murder;

(B) The murder was committed while the accused was engaged in the commission or attempted commission of any robbery, rape, aggravated arson, sodomy, burglary, kidnapping, mutiny, sedition, or piracy of an aircraft or vessel, or was engaged in flight or attempted flight after the commission or attempted commission of any such offense;

(C) The murder was committed for the purpose of receiving money or a thing of value;

(D) The accused procured another by means of compulsion, coercion, or a promise of an advantage, a service, or a thing of value to commit the murder;

(E) The murder was committed with the intent to avoid or to prevent lawful apprehension or effect an escape from custody or confinement;

(F) The victim was the President of the United States, the President-elect, the Vice President, or, if there was no Vice President, the officer in the order of succession to the office of President of the United States, the Vice–President–elect, or any individual who is acting as President under the Constitution and laws of the United States, any Member of Congress (including a Delegate to, or Resident Commissioner in, the Congress) or Member-of–Congress elect, justice or judge of the

---

**2.** The Fourteenth Amendment only applies to the States.

**3.** Appellant was tried between January and April 1989 at Fort Hood, Texas. As we noted in *United States v. Loving,* 41 MJ 213, 232 (1994), a sentence hearing was held in accordance with RCM 1004, Manual for Courts–Martial, United States, 1984 (Change 2) (Change 3 to the Manual was dated June 1, 1987, but did not amend the Change 2 version of RCM 1004.).

United States, a chief of state or head of government (or the political equivalent) of a foreign nation, or a foreign official (as such term is defined in section 1116(b)(3)(A) of title 18, United States Code), if the official was on official business at the time of the offense and was in the United States or in a place described in Mil.R.Evid. 315(c)(2), 315(c)(3);

(G) The accused then knew that the victim was any of the following persons in the execution of office: a commissioned, warrant, noncommissioned, or petty officer of the armed services of the United States; a member of any law enforcement or security activity or agency, military or civilian, including correctional custody personnel; or any firefighter;

(H) The murder was committed with intent to obstruct justice;

(I) The murder was preceded by the intentional infliction of substantial physical harm or prolonged, substantial mental or physical pain and suffering to the victim;

(J) The accused has been found guilty in the same case of another violation of Article 118;

(8) *That only in the case of a violation of Article 118(4), the accused was the actual perpetrator of the killing* [.]

(Emphasis added.)

I will address his arguments concerning the invalidity of his death penalty in light of this Manual provision.

### III

Disproportionate Punishment under *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982)

A preliminary question this Court must decide is whether imposition of the death penalty in appellant's case is barred by the Supreme Court's disproportionate-punishment holding in *Enmund v. Florida, supra. See Kills on Top v. State*, 279 Mont. 384, 928 P.2d 182, 200–04 (1996); *Deputy v. Taylor*, 19 F.3d 1485, 1496–98 (3d Cir.1994). There, the Supreme Court held, in the case of a

felony murderer named Enmund, that imposition of the death penalty "in the absence of proof that Enmund killed or attempted to kill, and regardless of whether Enmund intended or contemplated that life would be taken" violated the Eighth Amendment. 458 U.S. at 801, 102 S.Ct. at 3378–79; *see Cabana v. Bullock*, 474 U.S. 376, 386, 106 S.Ct. 689, 696–97, 88 L.Ed.2d 704 (1986) ("*Enmund* ... imposes a categorical rule: a person who has not in fact killed, attempted to kill, or intended that a killing take place ... may not be sentenced to death."). Here, appellant was found guilty of the premeditated murder of Bobby Sharbino, *see* Art. 118(1), *in addition* to the felony murder of Christopher Fay. Therefore, there was proof and a finding of an intent to kill beyond a reasonable doubt in his case. *See also Hutchins v. Garrison*, 724 F.2d 1425, 1435 n. 14 (4th Cir.1983)(holding that *Enmund* does not "require any special *mens rea* for the imposition of death on a person who actually committed a killing and was convicted of first degree murder").

In addition, the members made a unanimous finding beyond a reasonable doubt based on overwhelming evidence in the record that appellant actually perpetrated the killing of Christopher Fay during the felony. *See Brooks v. State*, 104 Md.App. 203, 655 A.2d 1311, 1323 (1995); *People v. Anderson*, 43 Cal.3d 1104, 240 Cal.Rptr. 585, 605–07, 742 P.2d 1306, 1326–27 (1987)(*Enmund* and progeny hold that Eighth Amendment not violated if person sentenced to death "*in fact killed*" (emphasis added)). I see no violation of *Enmund* and its progeny in these circumstances. *See Tison v. Arizona*, 481 U.S. 137, 158, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987)("Only a small minority of those jurisdictions imposing capital punishment for felony murder have rejected the possibility of a capital sentence absent an intent to kill, and we do not find this minority position constitutionally required."). Finally, the evidence in this case overwhelmingly established appellant's intent to kill Christopher Fay.[4] *See*

---

**4.** Appellant confessed to killing Private Christopher L. Fay, a taxi-driver who appellant directed

to a secluded area of Fort Hood and robbed.

*Walton v. Arizona,* 497 U.S. 639, 648–49, 110 S.Ct. 3047, 3054–55, 111 L.Ed.2d 511 (1990) ("*Cabana* held that an appellate court could constitutionally make the *Enmund v. Florida* ... finding that the defendant killed, attempted to kill, or intended to kill in the first instance.").

### IV

Invalid Aggravating Factor under *Loving v. United States,* 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996)

Appellant, nonetheless, attacks his death penalty on the procedural grounds that the President, in establishing the "triggerman" aggravating factor, did "not narrow the death-eligible class in a way consistent with our cases." *Loving, supra* at 756, 116 S.Ct. at 1742; *see* Writ Appeal Petition at 1. He contends that the "actual-perpetrator" aggravator in RCM 1004(c)(8) ("That only in the case of a violation of Article 118(4), the accused was the actual perpetrator of the killing"[.] ) is legally insufficient to impose death as a penalty. *See Tuilaepa v. California,* 512 U.S. 967, 971, 114 S.Ct. 2630, 2634, 129 L.Ed.2d 750 (1994) ("To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment."). He argues that it is invalid because it still "permits death to be imposed for felony murder even

if the accused had no intent to kill." *Loving, supra* at 756, 116 S.Ct. at 1742; *see United States v. Cheely,* 36 F.3d 1439, 1443 n. 9 (9th Cir.1994) [5] ("The *least* culpable mental state the Supreme Court has held death-eligible is reckless indifference to human life during commission of a felony.").

There are several reasons why I reject appellant's claim that RCM 1004(c)(8) is an invalid or insufficient aggravating factor under the Supreme Court's *Loving* decision.

First of all, I note that RCM 1004(c)(8) permits the death penalty to be imposed on the felony murderer who actually kills a person during the felony ("actual perpetrator of the killing"). In *Loving, supra* at 756, 116 S.Ct. at 1742, the Supreme Court held Article 118 invalid because it "permits death to be imposed for felony murder even if the accused had no intent to kill *and* even if he did not do the killing himself." (Emphasis added.) RCM 1004(c)(8) does not violate both prongs of *Loving.*

Second, the Supreme Court in *Enmund v. Florida, supra,* and its progeny clearly held that the death penalty is not disproportionate for a felony murderer who actually kills a person during the felony. "Enmund did not kill or intend to kill and thus his culpability is plainly different from that of the robbers who killed; yet the State treated them alike and attributed to Enmund the culpability of

---

The Court of Military Review summarized his confession as follows:

"Dissatisfied with the meager amount of money he had obtained from the 7–Eleven robberies, appellant made the intentional and considered decision to rob taxicab drivers. On the night of 12 December 1988, appellant called for a taxicab to take him from a grocery store in Killeen to his barracks at Fort Hood. The driver of the taxicab was an Army private [Fay] who was moonlighting for extra money. After entering the taxicab and after arriving at Fort Hood, appellant directed the driver to park in a dark secluded area behind the barracks. He produced a pistol, held the pistol to the driver's head, ordered the driver to shut off the car's motor and lights, and demanded all the driver's money. After replying "bullshit" to the driver's protests that he had surrendered all of the money, appellant shot the driver in the back of the head. While looking at the hole in the back of the victim's head and the blood "gushing out," appellant cocked the pis-

tol and shot him in the back of the head again. The taxi driver died as a result of these gunshot wounds."

34 MJ 956, 959 (1992). Accident or accidental killing is simply not a reasonable possibility in these circumstances. Accordingly, failure to expressly instruct on the requirement for an intent to kill as part of being an actual perpetrator of a killing was clearly harmless beyond a reasonable doubt. *See People v. Johnson,* 6 Cal.4th 1, 23 Cal.Rptr.2d 593, 618, 859 P.2d 673, 698 (1993); *see also People v. Osband,* 13 Cal.4th 622, 55 Cal.Rptr.2d 26, 89–90, 919 P.2d 640, 720–21 (1996) (Kennard, J., concurring and dissenting).

5.  Appellant has cited note 9 of *Cheely* as support for his argument that RCM 1004(c)(8) (actual perpetrator of killing) is an invalid aggravator under *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). The Court in that case, however, did not decide that question because Cheely was charged with "intentional murder," not felony murder. 36 F.3d at 1443 and n. 10.

those who killed the ... [victims]. This was impermissible under the Eighth Amendment." 458 U.S. at 798, 102 S.Ct. at 3377. In *Tison*, 481 U.S. at 149-50, 107 S.Ct. at 1683-84, the Court spoke more clearly in these words:

> *Enmund* explicitly dealt with two distinct subsets of all felony murders in assessing whether Enmund's sentence was disproportional under the Eighth Amendment. At one pole was Enmund himself: the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state. Only a small minority of States even authorized the death penalty in such circumstances and even within those jurisdictions the death penalty was almost never exacted for such a crime. The Court held that capital punishment was disproportional in these cases. *Enmund also clearly dealt with the other polar case: the felony murderer who actually killed, attempted to kill, or intended to kill.* The Court clearly held that the equally small minority of jurisdictions that limited the death penalty to these circumstances could continue to exact it in accordance with local law when the circumstances warranted.

(Emphasis added.) In this light, RCM 1004(c)(8) also passes muster because it requires actual killing by the felony murderer. *See also Perdue v. Commonwealth*, 916 S.W.2d 148, 166 (Ky.1995)(*Enmund* not applicable where felony murderer a principal).

Third, this Court has already indicated that RCM 1004(c)(8) complies with *Enmund*. In *Curtis*, 32 MJ at 265-66, we said:

> " Aggravating factor" (8) applies only in the case of a violation of Article 118(4), and so relates only to felony murders. We have held that an accused may be convicted of murder under Article 118(4) even though he did not kill the victim and only aided and abetted commission of the felony on which the felony-murder conviction was based. *United States v. Jefferson*, 22 MJ 315 (CMA 1986). The Supreme Court has concluded that the Eighth Amendment is violated when a defendant is sentenced to death for a felony murder *if he did not*

*participate actively in the killing. Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); *but cf. Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (upholding a death penalty for an accused who did not kill the victim, but whose conduct was related to the killing).

(Emphasis added.)

Finally, several State Supreme Courts have considered the effect of *Enmund v. Florida, supra*, on aggravating factors similar to RCM 1004(c)(8) and have found no Eighth Amendment violation. *See Brooks v. State*, 104 Md.App. 203, 655 A.2d 1311 (1995); *People v. Anderson*, 43 Cal.3d 1104, 240 Cal. Rptr. 585, 742 P.2d 1306 (1987); *see generally Calhoun v. State*, 297 Md. 563, 468 A.2d 45 (1983); *but see State v. Ramseur*, 106 N.J. 123, 524 A.2d 188, 220 n. 21 (1987).

## V

## *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988)

Appellant additionally argues that RCM 1004(c)(8) is invalid because it does not "genuinely narrow the class of persons eligible for the death penalty [or] ... reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *See Loving*, 517 U.S. at 755, 116 S.Ct. at 1742, quoting *Lowenfield, supra* at 244, 108 S.Ct. at 554. He asserts that this aggravating factor is meaningless and is the equivalent of saying any felony murderer who acts alone is death eligible. I disagree.

Article 118 proscribes murder in the military and breaks it down into four groups: premeditated, intentional, wanton disregard, and certain felony murders. It then further narrows these four groups to two groups: premeditation and certain felony murders, which are initially eligible for the death penalty. *See Gray v. Lucas*, 677 F.2d 1086, 1104 (5th Cir.1982) (provides "rational basis" for determining death penalty appropriate for felony murders). RCM 1004(c)(8) still further narrows the class of felony murders to those who actually kill during the felony. *See generally Enmund v. Florida, supra.* In my view, a genuine narrowing has occurred in making only felony murderers who have actually killed during the felony eligible for

death. *See Johnson v. Dugger,* 932 F.2d 1360, 1369–70 (11th Cir.1991); *Grandison v. State,* 341 Md. 175, 670 A.2d 398, 409 (1995); *Calhoun,* 468 A.2d at 75.

## VI

### RCM 1004(c)(8) and Intent to kill

Assuming an intent to kill is required as a necessary aggravating factor to permit imposition of the death penalty on a person who is guilty of felony murder, I would still find no error in this case. Admittedly, Article 118 permits imposition of the death penalty on one who is guilty of felony murder "even if the accused had no intent to kill and even if he did not do the killing himself." Moreover, the Supreme Court found this statutory provision inadequate by itself to constitutionally permit imposition of the death penalty. However, the Supreme Court in *Loving* also clearly held that the President could lawfully promulgate "additional aggravating factors establishing a higher culpability ... necessary to save Article 118." 517 U.S. at 756, 116 S.Ct. at 1742.

RCM 1004(c)(8) is such an additional aggravating factor. It establishes as an aggravating factor: "That only in the case of a violation of Article 118(4), the accused was the actual perpetrator of the killing." In my view this language requires as a matter of common sense that the members find appellant killed during the felony with an intent to kill. *See generally Tuilaepa,* 512 U.S. at 976, 114 S.Ct. at 2637 ("Factor (b) is phrased in conventional and understandable terms."). This conclusion flows from the common meaning of "perpetrate" as "to bring about or carry out (as a crime)." Webster's Ninth New Collegiate Dictionary 877 (9th ed.1991); *see People v. Harrison,* 176 Cal.App.2d 330, 1 Cal.Rptr. 414 (1959), *decision disapproved, People v. Washington,* 62 Cal.2d 777, 44 Cal. Rptr. 442, 446–47, 402 P.2d 130, 134–35 (1965).

Professor Perkins confirms this well-established meaning of this term by stating:

> Culpable parties are of four different kinds, who may be called respectively: (1) perpetrators, (2) abettors, (3) inciters, and (4) criminal protectors. A "perpetrator," as here used, is one who, *with mens rea,*[11]

has caused a socially-harmful occurrence either with his own hands, or by means of some tool or instrument or other non-human agency, or by means of an innocent agent. Nothing novel is involved in this suggestion, because the word has been employed with this meaning at least since the time of Blackstone.[12]

> 11. *That is, one who has acted with malice aforethought or with criminal negligence in a homicide case,* with *animus furandi* in a larceny case, with intent to commit a felony in a burglary case or, in other words, *with whatever kind of mind at fault is required in order that the particular socially-harmful occurrence may be classified as a crime.*

> 12. 4 Bl. Comm. [Blackstone's Commentaries] *34. See also Smith v. State,* 37 Ark. 274, 276 (1881); *In re Vann,* 136 Fla. 113, 118, 186 So. 424, 426 (1939). One court has spoken of an offender who commits his offense by the aid of an innocent agent as "not the actual perpetrator." *People v. Whitmer,* 369 Ill. 317, 320, 16 N.E.2d 757, 759 (1938). But if emphasis is placed on the crime rather than the mere physical occurrence it seems proper to say that one who has contrived to bring about the prohibited result by the employment of innocent hands, has perpetrated his offense in this manner.

R. Perkins and R. Boyce, *Criminal Law* 723–24 (3d ed.1982)(emphasis added); *see also* B. Garner, *A Dictionary of Modern Legal Usage* 653 (2d ed. 1995)(*"Perpetrator =* one who, with mens rea (q.v.) has caused a socially harmful occurrence either personally or through some ... agent.") Accordingly, even accepting appellant's view of *Enmund v. Florida, supra,* and its progeny as requiring proof of an intent to kill, I find such a requirement in RCM 1004(c)(8).

## VII

### Harmless error

In any event, I agree with the majority opinion that any error in considering RCM 1004(c)(8) as a constitutionally valid aggravating factor in this case was harmless. *See generally Stringer,* 503 U.S. at 232, 112 S.Ct. at 1137. RCM 1004(c) provides: "Death may

be adjudged only if the members find, beyond a reasonable doubt, *one* or more ... aggravating factors." (Emphasis added.) As noted above, there were two other valid aggravating factors in this case which made appellant death eligible. Moreover, I agree that appellant's triggerman status, at the very least, could be considered in the subsequent weighing step as an aggravating circumstance under RCM 1004(b)(4)(C) ("Death may not be adjudged unless—... (C). All members concur that any extenuating or mitigating circumstances are substantially outweighed by any aggravating circumstances admissible under RCM 1001(b)(4), including the factors under subsection (c) of this rule.") The fact of appellant's status as an actual triggerman was properly before the members as aggravation under RCM 1001(b)(4). *See Williams v. Clarke,* 40 F.3d 1529, 1542 (8th Cir.1994)(error not "as egregious" as where "sentencer considers an aggravating circumstance that would not otherwise have been established or not considered at all"). Finally, I agree that the military judge's instructions and counsel's arguments remove any reasonable possibility that appellant was prejudiced by the number of capital offenses or the number of valid aggravating factors in this case. *See Davis v. Executive Director of Department of Corrections,* 100 F.3d 750, 774 (10th Cir.1996); *United States v. Tipton,* 90 F.3d 861, 900 (4th Cir.1996); *United States v. Chandler,* 996 F.2d 1073, 1093 (11th Cir.1993)("instructions made clear that the weighing process was not a mechanical one ... based on the number of aggravating ... factors").

This case has made a long march through the American judicial system. Here, at the end, I am satisfied that Dwight Loving has had a fair trial and appeal. I find no defect in the Federal law or its process that has been applied to this result of capital punishment. Accordingly, I vote to affirm the decision below denying the petition for extraordinary relief.

EFFRON, Judge (concurring in part and dissenting in part):

I concur in denying both appellant's petition for extraordinary relief and his petition for reconsideration of mandatory review insofar as either action would require this Court to reconsider the findings of guilty affirmed upon mandatory review. 41 MJ 213 (1994). I dissent with respect to the majority's decision to affirm the sentence, however, because fundamental questions regarding the legality of the sentencing proceeding remain unresolved.

Three commissioned officers of the United States Army who served as members of appellant's court-martial panel have executed sworn affidavits describing the sentencing procedures used in this case. Each of the affidavits describes circumstances that constitute significant violations of procedures designed to ensure fairness in capital sentencing by precluding the proceedings from being infected by unlawful command influence. The affidavits do not reflect any juror remorse over imposition of the death penalty, and nothing in the record indicates that any of these officers had a motive to fabricate. Each officer set forth in neutral terms his recollection of the sentencing process. *See* 41 MJ at 331–33. The majority, however, has refused to permit any inquiry into the voting procedures used to impose the death penalty in this case.[1]

Before appellant's death sentence may be affirmed, applicable law and precedent require us to consider the impact of the sworn statements from these three officers. The statements contain direct evidence of specific violations of the carefully constructed procedures designed to ensure that the death penalty is not imposed in an arbitrary and capricious manner by a court-martial panel.

## I. THE UNIQUE PURPOSES AND PROCEDURES OF A COURT-MARTIAL PANEL

### A. Background

In civilian life, there are few rules that

1. The discussion of the voting procedures referred to herein is set forth in the initial majority opinion of this Court. 41 MJ 213, 235–39 (1994).

govern the conduct of jury proceedings.[2] In contrast, the Uniform Code of Military Justice and the Manual for Courts–Martial provide detailed guidance governing the proceedings of court-martial panels and reflect longstanding military practice. All voting is by secret written ballot. Art. 51(a), Uniform Code of Military Justice, 10 USC § 851(a). A proposed sentence, which may be recommended by any member, must "be in writing" and "contain the complete sentence" proposal. RCM 1006(c), Manual for Courts–Martial, United States (1995 ed.).[3] "All members ... vote on each proposed sentence in its entirety," and the members vote first on the least severe sentence. RCM 1006(d)(3)(A). If the least severe proposed sentence is not adopted, the members then vote on "the next least severe," and this process continues "until a sentence is adopted." *Id.* The ballots are counted by the junior member of the panel. RCM 1006(d)(3)(B). A sentence is adopted when it has the votes of two-thirds of the members, except that confinement for life or more than 10 years requires the votes of three-fourths of the members, and a death sentence requires a unanimous vote. Art. 52(b), UCMJ, 10 USC § 852(b); RCM 1006(d)(4).[4] After a sentence has been adopted, the members may not reconsider the sentence unless they have been instructed by the military judge on the procedures for reconsideration and they agree by secret written ballot to reconsider the sentence. RCM 1009(d), Manual for Courts–Martial, United States (1994 ed.).

### B. Selection Of A Court–Martial Panel

These rules reflect the fundamental distinctions between a civilian jury and a court-martial panel. In a civilian proceeding, an accused person has a constitutional right to trial by a jury of peers selected at random from a representative cross-section of the community. U.S. Const. amend. VI; Jury Selection and Service Act of 1968, 28 USC §§ 1861–69; *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). A person's status or stature in the community is not a permissible basis for selection to serve on a jury, although certain circumstances, such as a felony conviction, may disqualify an individual from serving. A civilian jury is concerned primarily with adjudication of guilt, although juries in some jurisdictions have a role in the sentencing process, particularly in capital cases.

A court-martial panel has a much broader function than a civilian jury. Unless the accused requests a bench trial, the court-martial panel determines guilt and adjudges the sentence. A court-martial panel is empowered not only to impose the typical criminal law punishments of confinement and fines, but also to adjudge a sentence that affects an individual's military status. Permissible punishments include reductions in rank, forfeiture of pay and allowances, and separation from military service. The court-martial panel is not simply an element of a criminal law system; it also plays a key role in management of military personnel and maintenance of good order and discipline in the armed forces. *See* R. Everett, *Military Justice in the Armed Forces of the United States* 4–7 (1956).

Given the unique functions of a court-martial, it has long been held that a military accused does not have a constitutional right to a panel randomly selected from a cross-section of the military community. Art. 25, UCMJ, 10 USC § 825; *Ex parte Quirin,* 317 U.S. 1, 39–41, 63 S.Ct. 2, 16–17, 87 L.Ed. 3 (1942); *United States v. Smith,* 27 MJ 242, 248 (CMA 1988); *see also United States ex rel. Toth v. Quarles,* 350 U.S. 11, 17–18, 76 S.Ct. 1, 5–6, 100 L.Ed. 8 (1955). Selection of

---

2. *See, e.g.,* Fed.R.Crim.P. 31.

3. All references are to this edition of the Manual unless otherwise indicated. The Manual cited contains the provision applicable at trial.

4. Additional voting procedures apply in capital cases. The members may adjudge the death penalty only if: They have returned a unanimous finding of guilty as to a capital offense, RCM 1004(a)(1) & (2); they have unanimously found applicable at least one aggravating factor specified in the Manual for Courts–Martial, RCM 1004(b)(7); they have unanimously agreed "that any extenuating or mitigating circumstances are substantially outweighed by any" admissible "aggravating circumstances," RCM 1004(b)(4)(C); and they have unanimously vote to adjudge the death penalty, RCM 1006(d)(4)(A).

panel members is a function of command, and the manner of selection reflects the disciplinary role of the proceedings.

The convening authority who refers a case to trial selects the panel that will adjudicate the issue of guilt and, in the event of a finding of guilty, adjudge the sentence. Stature and status are permissible considerations in selecting a court-martial panel. The persons chosen by the convening authority are those "best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." Art. 25(d)(2); see also RCM 502(a)(1). All panel members are officers, unless an enlisted accused requests inclusion of enlisted members; and, if possible, members of a court-martial panel normally must be equal to or senior in rank and grade to the accused. Art. 25(c)(1) and (d)(1). As a result of these criteria, the military personnel detailed to sit on courts-martial are likely to be relatively senior and are likely to have command or supervisory experience.

Consistent with standard military practice, the officer senior in rank serves as the leader of the court-martial panel and is designated as the president. RCM 502(b)(1). In addition to the duties assigned to other members, the president presides over the closed sessions of the court-martial during deliberations of the members. RCM 502(b)(2)(A). We have recognized that the authority to preside includes "the discretion to call for a vote when, in their judgment, discussion of the issues is complete or further debate would be pointless." United States v. Accordino, 20 MJ 102, 105 (1985). The president also speaks for the members in announcing decisions or when "requesting instructions from the military judge." RCM 502(b)(2)(B).

Within the court-martial proceeding, specific attention is given to the rank structure of the panel. For example, the Discussion accompanying RCM 911 notes: "The members are seated with the president, who is the senior member, in the center, and the other members alternately to the president's right and left according to rank. If the rank of a member is changed, or if the membership of the court-martial changes, the members should be reseated accordingly." Each member is in uniform, which contains a visible display of the insignia of rank.

The customs, traditions, and rules that govern military life reinforce the authority of the president of a court-martial and the willingness of members to respect that authority. Obedience to superiors is one of the fundamental norms of military life, emphasized from the very inception of military status in the oath of enlistment, 10 USC § 502, and reinforced by the criminal sanctions that may be imposed for disobedience, Arts. 90, 91, and 92, UCMJ, 10 USC §§ 890, 891, and 892, respectively. The Supreme Court has observed that "to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps." Goldman v. Weinberger, 475 U.S. 503, 507, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986).

Congress and the President have determined that our national security requires a military justice system that involves the express recognition of rank in selection of court-martial members and in the role of the presiding officer. Although these characteristics find no parallel in the attributes of civilian juries, the Supreme Court has recognized that the differences are permissible because "[t]he military constitutes a specialized community governed by a separate discipline from that of the civilian." Orloff v. Willoughby, 345 U.S. 83, 94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953).

Congress and the President have recognized that the maintenance of good order and discipline requires more than an unfettered role for command in the court-martial process. Military law, from the time of the first Articles of War through the establishment of the Uniform Code of Military Justice, has reflected an understanding that members of the armed forces are more likely to obey orders under a disciplinary system which is fair and which they perceive to operate without the unlawful influence of rank. This understanding is implemented through provisions such as the general prohibition against unlawful command influence, Art. 37, UCMJ, 10 USC § 837, as well as specific provisions

designed to minimize the influence of rank within a court-martial panel. The general admonitions against use of rank to control the exercise of judgment, *e.g.,* RCM 502(a)(2), 921(a), and 1006(a), are reinforced by the specific procedural rules noted in Part A, *supra,* such as the requirements for secret written ballots and written sentence proposals, reliance on the junior member to count the votes, and limitations on reconsideration.

### C. Appellate Review Of Improper Influences In The Voting Process

The rules governing the procedures of a court-martial panel are not self-executing. Trial and appellate courts may entertain allegations that the rules were violated. Under RCM 1008:

> A sentence which is proper on its face may be impeached only when extraneous prejudicial information was improperly brought to the attention of a member, outside influence was improperly brought to bear upon any member, or unlawful command influence was brought to bear upon any member.[5]

The Drafter's Analysis, Manual, *supra* at A21–74, notes that this rule is based in part on Mil.R.Evid. 606(b), Manual, *supra,* "*Inquiry into validity of findings or sentence,*" which provides:

> Upon an inquiry into the validity of the findings or sentence, a member may not testify as to any matter or statement occurring during the course of the deliberations of the members of the court-martial or, to the effect of anything upon the member's or any other member's mind or emotions as influencing the member to assent to or dissent from the findings or sentence or concerning the member's mental process in connection therewith, except that a member may testify on the question whether extraneous prejudicial information was improperly brought to the attention of the members of the court-martial, whether any outside influence was improperly brought to bear upon any member, or whether there was unlawful command in-

fluence. Nor may the member's affidavit or evidence of any statement by the member concerning a matter about which the member would be precluded from testifying be received for these purposes.

This rule of evidence is virtually identical to Fed.R.Evid. 606(b), with the critical addition of authority to obtain evidence concerning "unlawful command influence." As noted in the Drafter's Analysis, "The addition is required by the need to keep proceedings free from any taint of unlawful command influence and further implements Article 37(a) of the Uniform Code of Military Justice. Use of superior rank or grade by one member of a court to sway other members would constitute unlawful command influence for purposes of this Rule...." Manual, *supra* at A22–44.

In Mil.R.Evid. 606(b), as in its civilian counterpart, a "balance is struck between the necessity for accurately resolving criminal trials in accordance with rules of law on the one hand, and the desirability of promoting finality in litigation and of protecting members from harassment and second-guessing on the other hand." S. Saltzburg, L. Schinasi, & D. Schlueter, *Military Rules of Evidence Manual* 722 (4th ed.1997).

In *Accordino,* we considered whether civilian precedents, including precedents under Fed.R.Evid. 606(b), would preclude consideration of affidavits from court members concerning the procedure employed by the president of a court-martial. 20 MJ at 104. Two members of the court-martial panel in *Accordino* executed post-trial affidavits alleging that the president of the court-martial, during deliberation on findings, prematurely cut off discussion and precipitated a vote. *Id.* at 103.

In *Accordino,* the Air Force Court of Military Review[6] refused to consider the affidavits, citing civilian precedents holding that jurors are not competent to challenge verdicts based upon internal influences. 15 MJ 825, 834–42 (1983). We expressly rejected reliance on civilian precedents with respect

---

5. A similar rule applies to the impeachment of findings. RCM 923.

6. Now the Court of Criminal Appeals. *See* 41 MJ 213, 229 n. * (1994).

to issues involving unlawful command influence, stating:

> [T]hese cases miss the point. Military courts, with their explicit rank structure, are quite different from their civilian jury counterparts. Thus Federal precedents, which naturally do not address a concept of "command influence" within civilian juries, are of extremely limited value to us in construing our own rule.

20 MJ at 104 (footnote omitted).

We also made it clear that an affidavit raising the potential for command influence would entitle an accused to further review without the necessity of demonstrating actual command influence:

> [T]he court members' affidavits were proper matters for examination by any and all authorities having jurisdiction over the case. The purpose of such review is, however, limited to looking for evidence of any of the three specific exceptions to Mil. R.Evid. 606(b). Under our legal threshold of review . . ., the affidavits do not indicate unlawful command influence. However, the Court of Military Review, with its broader factual-review authority . . ., must examine the affidavits under its own standards.

20 MJ at 105. The fact that the president had used his position of authority to limit discussion and initiate voting, *id.* at 103, was considered to raise the possibility of undue command influence.

## II. DISCUSSION

In the case before us, as in *Accordino*, we are faced with affidavits from court members that indicate violations of the rules designed to preclude the unlawful influence of rank in the process. The affidavits before us, executed by three commissioned officers, reveal violations more numerous and more significant than the violations we considered in *Accordino*. In the present case, however, the majority has held that the sworn testimony of commissioned officers specifically selected to sit on a court-martial in a capital case is "not competent evidence," 41 MJ at 236, and that, in any case, the affidavits reveal "no more than Colonel Aylor's proper

exercise of authority as president to preside over the deliberations." *Id.* at 238.

Judge Wiss, in his dissent from this Court's initial ruling, observed that the affidavits indicate six separate procedural deviations, 41 MJ at 313–14:

First, that the "members did not vote . . . on any of the aggravating factors relied upon by the prosecution," in violation of RCM 1004(b)(7). *See, e.g., United States v. Curtis*, 32 MJ 252, 257–60, 268 (CMA 1991) (detailing the RCM 1004 procedures that protect a capital defendant's Fifth and Eighth Amendment rights).

Second, that there "was no vote . . . on whether the aggravating circumstances outweighed the extenuating and mitigating circumstances," in violation of RCM 1004(b)(4)(C).

Third, that the members did not submit written proposals recommending sentences "in their entirety," in violation of RCM 1006(c). *See United States v. Gutierrez*, 11 MJ 122, 123 (CMA 1981) ("one sentence is imposed for all offenses before the court").

Fourth, that the members did not conduct a separate vote on the proposal for a life sentence before voting on the death penalty, in violation of RCM 1006(d)(3)(A). *See United States v. Thomas*, 46 MJ 311, 313–14 (1997); *United States v. Johnson*, 18 USCMA 436, 437, 40 CMR 148, 149, 1969 WL 6030 (1969) (Voting on the "lightest proposed sentence" first is "more than a mere technicality. It is, essentially, a part of military due process.").

Fifth, that the president, not the junior member, counted the ballots, in violation of Article 51(a) and RCM 1006(d)(3)(B).

Sixth, that the president, after counting ballots that revealed a non-unanimous vote for death, ordered a second vote without obtaining or following instructions from the military judge on reconsideration procedures, in violation of RCM 1009.

Judge Wiss pointed out that the voting procedures described in the affidavits "occurred as a result of the unilateral imposition by the senior-ranking member of the court-martial of a procedure that differed markedly

from the procedure that was plotted for the panel in the military judge's painstaking instructions." 41 MJ at 314. The president of a court-martial has no authority "to divine his own personally preferred procedural path toward a death sentence, in substantial disregard of the one that has been clearly prescribed by the President of the United States in the Manual for Courts–Martial and, in some instances, in substantial disregard as well of checkpoints along the way that are required by the Fifth and Eighth Amendments." *Id.*

The affidavits should be considered under Mil.R.Evid. 606(b) as competent evidence on the issue of unlawful command influence because, as Judge Wiss wrote, they "portray a scenario in which the senior-ranking member, solely by virtue of his rank, successfully imposed a procedure that was unlawful and that, in the process, destroyed the lawful procedural structure that would have substantially assured a fair and reliable sentence." *Id.*

The majority during our previous review of this case cited *Tanner v. United States,* 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), and numerous civilian precedents for the proposition that Fed.R.Evid. 606(b) precludes use of juror testimony to impeach a verdict except for "evidence of extraneous influence." 41 MJ at 236–37. The majority recognized that Mil.R.Evid. 606(b) goes beyond its federal civilian counterpart by also permitting testimony concerning unlawful command influence and cites, but did not attempt to distinguish, our decision in *Accordino.*[7] 41 MJ at 237.

In *Accordino,* we made clear that "[m]ilitary courts, with their explicit rank structure, are quite different from their civilian jury counterparts" and that "Federal precedents, which naturally do not address a concept of 'command influence' within civilian juries, are of extremely limited value to us in construing our own rule." 20 MJ at 104 (footnote omitted). In that case, we relied upon post-trial affidavits to set aside the decision below. Even though we determined that the information in the affidavits did not constitute evidence of unlawful command influence as a matter of law, we concluded that the potential for unlawful command influence resulting from the actions of the president of a court-martial required further review by a tribunal with factfinding powers.

In *Accordino,* we ordered further review to protect the rights of an individual convicted of wrongful drug use who was sentenced to a bad-conduct discharge, forfeiture of $250.00 pay for one month, and reduction to the pay grade of E–3. The case before us involves convictions for murder and a death sentence. The affidavits indicate an extensive role by the president of the court-martial in shaping a decision-making procedure that undermined the reliability of the sentencing process. We upheld the right of Sergeant Accordino to a proceeding compliant with the rules designed to preclude unlawful command influence within the court-martial panel. *Accordino,* which is a sound precedent, requires no less in the case of Private Loving. There is nothing in the Uniform Code or our precedents that would authorize a less favorable proceeding in a capital case than in a non-capital case. On the contrary, the additional procedural requirements in RCM 1004 for adjudication of the death penalty require at least as much, if not greater, concern in capital cases with respect to compliance with rules designed to preclude unlawful command influence.

Judge Wiss, dissenting during this Court's initial review, stated that the evidence of irregularities in the sentencing proceeding raised "the cancerous possibility that command influence inside the members' deliberation room during their consideration of a sentence so skewed the legally required voting procedures that it undermined the fundamental fairness of those proceedings." 41 MJ at 310. I agree.

## III. CONCLUSION

In view of the unresolved questions regarding unlawful command influence during

7. In *United States v. Brooks,* 42 MJ 484 (1995), an opinion issued subsequent to *Loving,* this Court precluded consideration of member testimony to impeach a verdict, but the opinion did not consider the issue of unlawful command influence and contains no discussion of *Accordino.*

the sentencing proceeding, I would remand this case for factfinding proceedings to determine if the procedures designed to protect against unlawful command influence were violated.