SOTOMAYOR, J., dissenting

# SUPREME COURT OF THE UNITED STATES

### BENNY LEE HODGE *v.* KENTUCKY

ON PETITION FOR WRIT OF CERTIORARI TO THE SUPREME
COURT OF KENTUCKY

No. 11–10974.   Decided December 3, 2012

The petition for a writ of certiorari is denied.

JUSTICE SOTOMAYOR, dissenting from denial of certiorari.

Petitioner Benny Lee Hodge was convicted of murder. Then, after his trial counsel failed to present any mitigation evidence during the penalty phase of his trial, he was sentenced to death. In fact, counsel had not even investigated any possible grounds for mitigation. If counsel had made any effort, he would have found that Hodge, as a child, suffered what the Kentucky Supreme Court called a "most severe and unimaginable level of physical and mental abuse." No. 2009–SC–000791–MR (Aug. 25, 2011), App. to Pet for Cert. 11. The Commonwealth conceded that counsel's performance was constitutionally deficient as a result. Yet the court below concluded that Hodge would have been sentenced to death anyway because even if this evidence had been presented, it would not have "explained" his actions, and thus the jury would have arrived at the same result. *Ibid.* This was error. Mitigation evidence need not, and rarely could, "explai[n]" a heinous crime; rather, mitigation evidence allows a jury to make a reasoned moral decision whether the individual defendant deserves to be executed, or to be shown mercy instead. The Kentucky Supreme Court's error of law could well have led to an error in result. I would grant the petition for certiorari, summarily vacate, and remand to allow the Kentucky Supreme Court to reconsider its decision under the proper standard.

## I

Hodge and two others posed as Federal Bureau of Inves-

tigation agents to gain entry to the home of a doctor. Once inside, they strangled the doctor into unconsciousness, stabbed his college-aged daughter to death, and stole around $2 million in cash, as well as jewelry and guns, from a safe. A jury convicted Hodge and a codefendant of murder and related charges. *Epperson* v. *Commonwealth*, 809 S. W. 2d 835, 837 (Ky. 1990). In advance of the penalty phase of his trial, Hodge's counsel conducted no investigation into potential mitigation evidence and presented no evidence to the jury. The Commonwealth did not put on evidence of aggravating circumstances either, beyond the facts of the crime. Instead, the parties agreed that the jury should be read this stipulation: "'Benny Lee Hodge has a loving and supportive family—a wife and three children. He has a public job work record and he lives and resides permanently in Tennessee.'" App. to Pet. for Cert. 5. After hearing argument from counsel on both sides, the jury recommended a sentence of death, which the trial court imposed.

On postconviction review in Kentucky state court, Hodge alleged that his counsel had been ineffective during the penalty phase for failing to investigate, discover, and present readily available mitigation evidence concerning his childhood, which was marked by extreme abuse. Hodge was granted an evidentiary hearing, during which he presented extensive mitigation evidence and the testimony of expert psychologists. The Commonwealth did not contest Hodge's evidence, although it did not concede that all the evidence would have been available or admissible at the time of trial. The Kentucky Supreme Court credited the evidence and found it would have been available at the time of trial. The evidence established the following:

The beatings began *in utero*. Hodge's father battered his mother while she carried Hodge in her womb, and continued to beat her once Hodge was born, even while she held the infant in her arms. When Hodge was a few years

older, he escaped his mother's next husband, a drunkard, by staying with his stepfather's parents, bootleggers who ran a brothel. His mother next married Billy Joe. Family members described Billy Joe as a "'monster.'" *Id.,* at 7. Billy Joe controlled what little money the family had, leaving them to live in abject poverty. He beat Hodge's mother relentlessly, once so severely that she had a miscarriage. He raped her regularly. And he threatened to kill her while pointing a gun at her. All of this abuse occurred while Hodge and his sisters could see or hear. And following many beatings, Hodge and his sisters thought their mother was dead.

Billy Joe also targeted Hodge's sisters, molesting at least one of them. But according to neighbors and family members, as the only male in the house, Hodge bore the brunt of Billy Joe's anger, especially when he tried to defend his mother and sisters from attack. Billy Joe often beat Hodge with a belt, sometimes leaving imprints from his belt buckle on Hodge's body. Hodge was kicked, thrown against walls, and punched. Billy Joe once made Hodge watch while he brutally killed Hodge's dog. On another occasion, Billy Joe rubbed Hodge's nose in his own feces.

The abuse took its toll on Hodge. He had been an average student in school, but he began to change when Billy Joe entered his life. He started stealing around age 12, and wound up in juvenile detention for his crimes. There, Hodge was beaten routinely and subjected to frequent verbal and emotional abuse. After assaulting Billy Joe at age 16, Hodge returned to juvenile detention, where the abuse continued. Hodge remained there until he was 18. Over the 16 years between his release from juvenile detention and the murder, Hodge committed various theft crimes that landed him in prison for about 13 of those years. He twice escaped, but each time, he was recaptured.

Psychologists who testified at Hodge's evidentiary hearing, and were credited by the court below, explained that the degree of domestic violence Hodge suffered was extremely damaging to his development. The environment caused "'hypervigilance'"—a state of constant anxiety that left Hodge always "'waiting for the next shoe to fall.'" Pet. for Cert. 7. It taught him "'that the world was a hostile place and that he was not going to be able to count on anybody else to protect him'"—not his family and not society. *Id.,* at 8. Being taken to a juvenile facility only to be beaten more likely hit Hodge as a "'double betrayal.'" *Id.,* at 9. The result was that Hodge had posttraumatic stress disorder. Unable to control his behavior and his emotions because of PTSD, he turned to drugs and alcohol to numb his feelings. This condition could have been diagnosed at the time of his trial.

The Commonwealth conceded that counsel was deficient for failing to gather and present this evidence at the penalty phase of Hodge's trial. But it contended that Hodge would have been sentenced to death even if the evidence had been presented. Examining the evidence, the Kentucky Supreme Court had "no doubt that Hodge, as a child, suffered a most severe and unimaginable level of physical and mental abuse." App. to Pet. for Cert. 11. Yet it felt "compelled to reach the conclusion that there exists no reasonable probability that the jury would not have sentenced Hodge to death" anyway. *Ibid.*

The Court based its conclusion in part on the aggravating circumstances against which the jury would have had to weigh the mitigation evidence. The murder itself was "calculated and exceedingly cold-hearted." *Id.,* at 9. Hodge stabbed the daughter "at least ten times," and he "coolly" told his codefendant that he knew the daughter "was dead because the knife had gone 'all the way through her to the floor.'" *Id.,* at 10. Hodge's conduct after the murder was shocking as well: He and the two other rob-

bers "brazenly spent the stolen money on a lavish lifestyle and luxury goods, including a Corvette," and Hodge told a cellmate he had "sprea[d] all the money out on a bed and ha[d] sex with his girlfriend on top of it." *Ibid.* Moreover, had Hodge put on evidence in mitigation, the Commonwealth may have sought to introduce evidence of Hodge's "long and increasingly violent criminal history, his numerous escapes from custody, and the obvious failure of several rehabilitative efforts." *Id.,* at 9.

The court's conclusion was also based, however, on what effect the mitigation evidence might have had:

> "Perhaps this information may have offered insight for the jury, providing some explanation for the career criminal he later became. If it had been admitted, the PTSD diagnosis offered in mitigation might have explained Hodge's substance abuse, or perhaps even a crime committed in a fit of rage as a compulsive reaction. But it offers virtually no rationale for the premeditated, cold-blooded murder and attempted murder of two innocent victims who were complete strangers to Hodge. Many, if not most, malefactors committing terribly violent and cruel murders are the subjects of terrible childhoods. Even if the sentencing jury had this mitigation evidence before it, we do not believe, in light of the particularly depraved and brutal nature of these crimes, that it would have spared Hodge the death penalty." *Id.,* at 11.

Accordingly, the court denied Hodge relief.

## II

The Sixth Amendment guarantees capital defendants the effective assistance of counsel during the penalty phase of trial. This right includes counsel's "obligation to conduct a thorough investigation of the defendant's background," *Williams* v. *Taylor*, 529 U. S. 362, 396 (2000), so

as "to uncover and present . . . mitigating evidence" to
the jury at sentencing. *Wiggins* v. *Smith*, 539 U. S. 510,
522 (2003). It is uncontested that trial counsel failed to
discharge that duty here. But to establish a Sixth
Amendment violation, Hodge must also demonstrate that
counsel's failures prejudiced his defense. In *Strickland* v.
*Washington*, 466 U. S. 668 (1984), we explained that a
"defendant must show that there is a reasonable probabil-
ity that, but for counsel's unprofessional errors, the result
of the proceeding would have been different." *Id.,* at 694.
In the capital sentencing context, to assess prejudice, "we
reweigh the evidence in aggravation against the totality of
available mitigating evidence." *Wiggins*, 539 U. S., at 534;
see also *Sears* v. *Upton*, 561 U. S. ___, ___ (2010) (*per
curiam*) (slip op., at 10–11); *Porter* v. *McCollum*, 558 U. S.
30, 41 (2009) (*per curiam*); *Rompilla* v. *Beard*, 545 U. S.
374, 393 (2005). The critical question is whether "there is
a reasonable probability that at least one juror would have
struck a different balance" in weighing the evidence for
and against sentencing the defendant to death. *Wiggins*,
539 U. S., at 537.[*]

In applying this standard, the Kentucky Supreme Court
properly took account of the possible evidence in aggrava-
tion. But in discounting the countervailing effect of
Hodge's proposed mitigation, the court misunderstood the
purpose of mitigation evidence. The court reasoned that
Hodge's mitigation evidence might have altered the jury's
recommendation only if it "explained" or provided some

———————

[*]At the time Hodge was sentenced, Kentucky required jury unanim-
ity to recommend a sentence of death. Cf. *Carson* v. *Commonwealth,*
382 S. W. 2d 85, 95 (Ky. App. 1964); Ky. Rev. Stat. Ann. §532.025
(Michie 1985). The trial court was responsible for the ultimate sentenc-
ing determination, but the jury's recommendation was to "carr[y] great
weight" in that decision. *Gall* v. *Commonwealth*, 607 S. W. 2d 97, 104
(Ky. 1980). See also *Porter*, 558 U. S., at 40, 42 (applying *Wiggins* to an
"advisory jury").

"rationale" for his conduct. App. to Pet. for Cert. 11. We have made clear for over 30 years, however, that mitigation does not play so limited a role. In *Lockett* v. *Ohio*, 438 U. S. 586 (1978), we held that the sentencer in a capital case must be given a full opportunity to consider, as a mitigating factor, "*any* aspect of a defendant's character or record," in addition to "any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.,* at 604 (plurality opinion) (emphasis added). We emphasized the "need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual." *Id.,* at 605. This rule "recognizes that 'justice . . . requires . . . that there be taken into account the circumstances of the offense together with the character and propensities of the offender,'" as part of deciding whether the defendant is to live or die. *Eddings* v. *Oklahoma*, 455 U. S. 104, 112 (1982) (quoting *Pennsylvania ex rel. Sullivan* v. *Ashe*, 302 U. S. 51, 55 (1937)). And it ensures that "'the sentence imposed at the penalty stage . . . reflect[s] a reasoned *moral* response to the defendant's background, character, and crime.'" *Abdul-Kabir* v. *Quarterman*, 550 U. S. 233, 252 (2007) (quoting *California* v. *Brown*, 479 U. S. 538, 545 (1987) (O'Connor, J., concurring)).

Thus we have consistently rejected States' attempts to limit as irrelevant evidence of a defendant's background or character that he wishes to offer in mitigation. In *Skipper* v. *South Carolina*, 476 U. S. 1 (1986), for example, we held that the exclusion of evidence regarding the defendant's good behavior in jail while awaiting trial deprived him of "his right to place before the sentencer relevant evidence in mitigation of punishment." *Id.,* at 4. We explained that the jury "could have drawn favorable inferences . . . regarding [the defendant's] character and his probable future conduct." *Ibid.* Although "any such inferences would not relate specifically to [the defendant's] culpabil-

ity for the crime he committed, . . . such inferences would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.'" *Id.,* at 4–5 (quoting *Lockett*, 438 U. S., at 604 (plurality opinion)).

Particularly instructive is *Smith* v. *Texas*, 543 U. S. 37 (2004) (*per curiam*). In *Smith*, the Texas courts withheld a mitigation instruction concerning the defendant's background, on the ground that he had offered "no evidence of any link or nexus between his troubled childhood or his limited mental abilities and this capital murder." *Ex parte Smith*, 132 S. W. 3d 407, 414 (Tex. Crim. App. 2004). We rejected this "nexus" requirement as one we had "never countenanced," and we reiterated that the only relevant question is whether the proposed mitigation evidence would give a jury "a reason to impose a sentence more lenient than death." 543 U. S., at 44–45.

The Kentucky Supreme Court's opinion is plainly contrary to these precedents. The evidence of Hodge's brutal upbringing need not have offered any "rationale" for the murder he committed in order for the jury to have considered it as weighty mitigation. It would be enough if there were a "reasonable probability" that, because of Hodge's tragic past, the jury's "reasoned moral response" would instead have been to spare his life and sentence him to life imprisonment instead.

More fundamentally, the Kentucky Supreme Court appears to believe that in cases involving "violent and cruel murders," it does not matter that the "malefacto[r]" had a "terrible childhoo[d]"; the jury would return a death sentence regardless. App. to Pet. for Cert. 11. That view is contrary to our cases applying *Strickland*'s prejudice prong. In *Rompilla*, for example, we considered counsel's failure "to present significant mitigating evidence about Rompilla's childhood," which was as horrific as Hodge's, as well as his "mental capacity and health, and alcoholism." 545 U. S., at 378; see *id.,* at 391–392 (describing the abuse

in Rompilla's household while he was young). We concluded that "the undiscovered mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of Rompilla's culpability, and the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Id.,* at 393 (internal quotation marks, citations, and brackets omitted). We reached this conclusion notwithstanding that Rompilla had been convicted of stabbing a man repeatedly and setting him on fire. *Id.,* at 377. Similarly, we found prejudice in *Wiggins* even though the defendant had drowned a 77-year-old woman in her bathtub. 539 U. S., at 514. The evidence of "severe physical and sexual abuse" Wiggins suffered as a child was sufficiently "powerful" that "[h]ad the jury been able to place [Wiggins'] excruciating life history on the mitigating side of the scale, there [was] a reasonable probability that at least one juror would have struck a different balance." *Id.,* at 516, 534, 537.

The Kentucky Supreme Court's brief discussion of the weight and impact of Hodge's mitigation evidence reasonably suggests that its prejudice determination flowed from its legal errors. Perhaps if the court had afforded proper consideration to the mitigation evidence, it still would have reached the same result; it might have found no "reasonable probability" that the jury would have weighed Hodge's difficult past more heavily in its moral calculation than the callous nature of the crime and Hodge's history of imprisonment and escape. But, giving full effect to the mitigation evidence, the court may well have concluded that the story of Hodge's childhood was so extraordinary, "there is a reasonable probability that at least one juror would have struck a different balance" had the jury known. *Id.,* at 537; see also *Porter,* 558 U. S., at 42. A "reasonable probability" is only "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466

U. S., at 694. Absent its errors, the Kentucky Supreme Court may have found that minimal threshold met on these facts.

We are a reviewing court, so I would leave it to the Kentucky Supreme Court to reweigh the evidence under the proper standards in the first instance. But this is a capital case, and clear errors of law such as those here should be redressed. I respectfully dissent from our failure to grant the petition for certiorari, vacate the judgment below, and remand for further consideration.