SARAGOSA, Judge,
with whom PELOQUIN, Judge, joins, concurring in part and dissenting in part:
I concur with the majority of the Court in all respects regarding findings, post-trial processing, instructions, and the variety of additional systemic issues. I write separately in dissent from the majority’s opinion finding that the appellant failed to demonstrate ineffective assistance of counsel during the sentencing phase of his court-martial. Consistent with my original opinion on this case, United States v. Witt, 72 M.J. 727 (A.F.Ct.Crim.App.2013), I find trial defense counsel were constitutionally deficient in their representation of the appellant for their collective failure to follow up, investigate, discover, and thereby present extenuation and mitigation evidence. Specifically, counsel prejudicially failed to investigate the appellant’s closed-head injury resulting from a motorcycle accident, potential remorse evidence via Deputy Sheriff LF, and the appellant’s mother’s mental health records and diagnosis, thereby failing to utilize this evidence in preparing for the sentencing case and failing to present any of this mitigation evidence to the sen-tencer for consideration. The majority rejects the appellant’s claim of ineffective assistance of counsel on the basis that he has not established prejudice under the second prong of a Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), analysis. I disagree.
When examining whether the appellant was indeed prejudiced by his counsel’s errors, it is important to review the history of jurisprudence relating to death penalty cases and the importance and purpose of the extenuation and mitigation case, as it differs dramatically from the typical court-martial proceeding. At common law, the death penalty was mandatory for a wide variety of eases. To alleviate the mandatoiy imposition of death, various state statutes were passed imparting unfettered discretion to the sentencing body. See, e.g., McGautha v. California, 402 U.S. 183, 197-207, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971) reh’g granted, judgment vacated sub nom. Crampton v. Ohio, 408 U.S. 941, 92 S.Ct. 2873, 33 L.Ed.2d 765 (1972); see also Callins v. Collins, 510 U.S. 1141, 1146-47, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994) (Blackmun, J., dissenting). Over the years, so much discretion was instilled into the sentencing body that it unleashed a rash of inconsistent applications of the death penalty. See Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).
In 1972, the Supreme Court declared that glaring inequities in the administration of death, standardless discretion wielded by judges and juries, and pervasive racial and economic discrimination rendered the death penalty, at least as administered, “cruel and unusual” within the meaning of the Eighth Amendment.[50] Furman, 408 U.S. at 239, 92 S.Ct. 2726. In the wake of this seminal decision, the Court evaluated a variety of statutory schemes designed to satisfy the need for consistency and rationality. In upholding Georgia’s statute in Gregg v. Georgia, 428 U.S. 153, 189, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Supreme Court reiterated, “Furman mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.” The Court has since consistently held that the death penalty must be imposed “fairly, and with reasonable consistency, or not at all.” Eddings v. Oklahoma, 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). The Court has also rejected the extreme consistency provided by mandatory death penalty statutes .for limited offenses. Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).
In the years following Furman, the Supreme Court also began to emphasize how a death penalty case really is different. In Woodson, the Court noted, “Death, in its finality, differs more from life imprisonment *828 than a 100-year prison term differs from one of only a year or two.” Woodson, 428 U.S. at 305, 96 S.Ct. 2978 (opinion of Stewart, Powell, and Stevens, JJ.). Recognizing the qualitative difference of the death penalty, the Court found “there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.” Id. The Woodson Court went on to elucidate:
A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.
Id. at 304, 96 S.Ct. 2978.
In response to Furman and Gregg, Rule for Courts-Martial (R.C.M.) 1004 was create ed to give limitation, structure, and consistency to capital litigation in the military. See Analysis of Rules for Courts-Martial, Manual for Courts-Martial, United States, A21-76 (2012 ed.). The Rule combines procedures of “weighing” aggravators and mitigators adopted by some jurisdictions with procedures used by jurisdictions that do not require a balancing component. This combined procedure was explained and approved in Loving v. Hart, 47 M.J. 438, 442 (C.A.A.F.1998):
The military capital sentencing procedure set out in RCM 1004 and 1006 establishes four “gates” to narrow the class of death-eligible offenders. The first two gates parallel nonweighing jurisdictions in that the members must convict by unanimous vote (RCM 1004(a)(2)) and then find at least one aggravating factor by unanimous vote (RCM 1004(b)(4)(A)). Only after these two gates are passed does the weighing process begin. The third gate is a “weighing” gate, where the members must all “concur” that extenuating and “mitigating circumstances are substantially outweighed by any aggravating circumstances,” including the aggravating factors under RCM 1004(e). See RCM 1004(b)(4)(C). Only after these three gates are passed does an accused become “death eligible.”
I emphasize that, at the third gate in the court-martial sentencing proceeding, the members are weighing the totality of the sentencing evidence put before them: mitigation, extenuation, aggravating factors, and aggravating circumstances. And even when the members unanimously find that the collective aggravation evidence substantially outweighs the extenuating and mitigating circumstances, a death sentence is not a certainty :
The fourth and final gate is the sentencing decision itself under RCM 1006. Even if all members concur that extenuating and mitigating circumstances are substantially outweighed by aggravating circumstances, they must separately consider whether to impose the death sentence. A death sentence requires the unanimous vote of all members. RCM 1006(d)(4)(A).
Loving, 47 M.J. at 442 (emphasis added).
The majority opinion appears to focus only on the balancing of evidence required at Gate Three, while ignoring the members’ unfettered authority at Gate Four to exercise compassion, mercy, and complete discretion before rendering a decision on the ultimate punishment of death — regardless of the balance struck at Gate Three. Whether the majority is inadvertently disregarding Gate Four or collapsing it with Gate Three, the end result is the application of a standard I believe inconsistent with the clear intent of R.C.M. 1006(d)(4)(A) and Strickland as further addressed in detail below.
In this case, the issue is the members’ deliberation at this “fourth and final gate.” Once the members moved beyond the balancing required in Gate Three, they were then required to consider whether death was an appropriate sentence for the individual, now convicted, before them. In fact, the members were specifically instructed, “If you unanimously find one or more aggravating factors and even if you unanimously deter *829 mine that the extenuating and mitigating circumstances are substantially outweighed by the aggravating circumstances, you still have the absolute discretion to decline to impose the death sentence.” This absolute discretion is what makes it critical for the members to be presented with and consider all of the mitigating evidence relating to the appellant. To deny the members the opportunity to accord significance to relevant facets of the character and the record of the accused, or to the circumstances of the particular offense, is to exclude “from their consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind.” See Woodson, 428 U.S. at 304, 96 S.Ct. 2978.
“[T]he imposition of death by public authority ... is so profoundly different from all other penalties....” Lockett v. Ohio, 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The Supreme Court “has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake.” Eddings v. Oklahoma, 455 U.S. 104, 118, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (O’Connor, J., concurring). Consideration of the unique aspects of an individual, with full discretion for the members to allow for a measure of compassion and mercy, is what Gate Four is all about. In fact, the senteneer “may determine the weight to be given relevant mitigating evidence” — in this case, evidence omitted due to counsel’s errors— “[b]ut they may not give it no weight by excluding such evidence from their consideration,” Eddings, 455 U.S. at 114-15, 102 S.Ct. 869, and neither should this Court.
Our law insists that “the sentencer know and consider the defendant as a human being before deciding whether to impose the ultimate sanction.” Boyde v. California, 494 U.S. 370, 387, 110 S.Ct. 1190, 108 L.Ed.2d 316 (Marshall, J., dissenting). This “operates as a shield against arbitrary execution and enforces our abiding judgment that an offender’s circumstances, apart from his crime, are relevant to his appropriate punishment.” Id. “[T]he risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty ... is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.” Lockett, 438 U.S. at 605, 98 S.Ct. 2954. To deny the members the opportunity to consider this appellant’s circumstances, apart from his crime, where those circumstances were relevant to his appropriate punishment, absolutely undermines any confidence I can place in their decision so grave as to determine whether a human life should be taken or spared. There can be no greater prejudice to the appellant.
As the asserted issue in this case is one of ineffective assistance of counsel, I now turn to the requirements set forth in Strickland. First, an accused’s representation is constitutionally deficient if it falls “below an objective standard of reasonableness” or “outside the wide range of professionally competent assistance:” 466 U.S. at 688, 690, 104 S.Ct. 2052. Second, in order to prevail an appellant must establish that counsel’s “deficient performance prejudiced the defense.” Id. at 687, 104 S.Ct. 2052.
Because “[tjhere is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order [the Court in Strickland did] or even to address both components of the inquiry if the defendant makes an insufficient showing on one,” United States v. McConnell, 55 M.J. 479, 481 (C.A.A.F.2001) (second alteration in original) (quoting Strickland, 466 U.S. at 697, 104. S.Ct. 2052), the majority chose to first address the prejudice prong of Strickland. Without a finding of prejudice, it was not necessary to address whether counsel were deficient in their representation. As such, it is necessary in this dissent to articulate why both prongs of the Strickland test are satisfied.
The appellant’s assignments of error allege numerous allegations of ineffective assistance of counsel during the sentencing phase of the court-martial. I find three of the issues appellant raises meritorious: (1) his trial defense counsel failed to investigate evidence deriving from the appellant’s hospitalization and closed-head injury after a motorcycle *830 accident four months prior to the commission of the murders; (2) his tidal defense counsel failed to investigate and obtain mental health records pertaining to the hospitalization of the appellant’s mother at an inpatient mental health facility; and (3) his trial defense counsel failed to investigate and develop evidence of remorse through Deputy Sheriff LF.
When the issue is the adequacy of counsel’s investigation for the sentencing phase of a capital trial, “hindsight is discounted by pegging adequacy to ‘counsel’s perspective at the time’ investigative decisions are made.” Rompilla v. Beard, 545 U.S. 374, 381, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (citing Strickland, 466 U.S. at 689, 104 S.Ct. 2052). To assess the thoroughness of counsel’s investigative efforts, this Court must review performance for “reasonableness under prevailing professional norms.” Wiggins v. Smith, 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citing Strickland, 466 U.S. at 688, 104 S.Ct. 2052).
The Supreme Court has historically noted that the ABA Standards for Criminal Justice, including the Guidelines for Appointment and Performance of Counsel in Death Penalty Cases, are good guidelines for assessing “prevailing professional norms” and determining what is reasonable. See Strickland, 466 U.S. at 688-89, 104 S.Ct. 2052; Williams v. Taylor, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); Wiggins, 539 U.S. at 524, 123 S.Ct. 2527; Rompilla, 545 U.S. at 387, 125 S.Ct. 2456. Yet, while these standards are instructive, they are not mandated for military defense counsel. United States v. Murphy, 50 M.J. 4, 9, (C.A.A.F.1998) (citing United States v. Loving, 41 M.J. 213, 300 (C.A.A.F.1994)), quoted in Loving v. United States, 68 M.J. 1, 19-20 (C.A.A.F.2009) (Stucky, J., concurring in part and in the result). With respect to investigative efforts, Guideline 10.7 of the ABA Guidelines sets forth that “[cjounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.” American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (rev. ed.2003), reprinted in 31 Hofstra L.Rev. 913, 1015 (2003). The Commentary to Guideline 10.7 states counsel needs to explore medical history, including hospitalization, mental illness, family history of mental illness, physical injury, and neurological damage. Id. at 1022. Guideline 10.11 also sets forth an ongoing duty of counsel to “seek information that supports mitigation or rebuts the prosecution’s ease in aggravation.” Id. at 1055. In Wiggins, the Supreme Court focused on trial defense counsel’s investigation and stressed that counsel, in most cases, must pursue all reasonable leads.
As the majority opinion sets forth, trial defense counsel secured the services of a professional mitigation specialist and a forensic psychologist to assist with the trial preparation. The question presented is whether, despite the assistance of a mitigation specialist and forensic psychologist, trial defense counsel’s investigation into mitigating evidence fell short of performance expected by reasonably competent counsel. I find the three areas noted above to be constitutionally deficient as described further herein.

Motorcycle Accident Injury

The appellant asserts trial defense counsel were ineffective when they failed to investigate and develop potential mitigation evidence stemming from a motorcycle accident. The motorcycle accident occurred approximately four and a half months prior to the commission of the murders and attempted murder for which the appellant was found guilty. Specifically, the appellant argues counsel were remiss in failing to further investigate whether the appellant’s closed head injury may have resulted in a traumatic brain injury and thus failing to present such evidence to the members at sentencing. There is no question that the record is silent with respect to any evidence of this motorcycle accident.
“[Reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste.” Rompilla, 545 U.S. at 383, 125 S.Ct. 2456 (citing Wiggins, 539 U.S. at 525, 123 S.Ct. 2527). However, competent counsel must undertake a certain threshold of investigation by being reasonably diligent prior to making the strategic decision to “draw [the] line.” Id.
*831 Further, as the Supreme Court has pointed out:
[S]trategie choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.
Strickland, 466 U.S. at 690-91, 104 S.Ct. 2052.
With respect to this issue, the focus is not whether trial defense counsel acted reasonably in not presenting evidence of the motorcycle accident and closed head injury to the court-martial panel. Rather, the focus of this issue is whether the decision of trial defense counsel to limit the scope of their investigation into potential mitigating evidence stemming from that motorcycle accident was itself reasonable. To analyze the decisions of counsel in this case, an extensive timeline of events is necessary.
In August 2004, the mitigation specialist sent a memorandum to the appellant’s military trial defense counsel strongly recommending a full battery of psychological testing. She further conveyed her opinion that they had a responsibility to pursue any possible brain damage due to the closed head injury from the motorcycle accident and reported changes in behavior since that time. She conveyed to trial defense counsel that this was an important area of inquiry. She described her experience with closed head injuries and how often times such an injury can explain aberrant behavior. She made clear her recommendations for further investigation, neuropsychological testing, and brain scanning.
In October 2004, the defense forensic psychologist consultant, Dr. BM, conducted a series of psychological and neuropsychological tests on the appellant, but he had not yet reached any diagnosis. At this time, he had only met with the appellant twice: once on 4 October 2004, when he interviewed the appellant for approximately 5-6 hours, and once on 5 October 2004, when he spent an additional 7-8 hours conducting tests with the appellant and generated two pages of notes. It is unclear when the tests were actually scored, but the next two meetings with the appellant were not until June 2005.
Between October 2004 and June 2005, the mitigation specialist continued to insist on further neuropsychological testing and brain imaging to determine whether there was any evidence of a traumatic brain injury. She specifically recommended consultation with Dr. FW who specialized in this area.
In November 2004, approximately eleven months prior to the sentencing phase of the appellant’s court-martial, Major JW, appellate defense counsel, sent the appellant’s civilian trial defense counsel an e-mail referencing a prior conversation about an article on brain scans; he included the website link for the article and offered to fax the article. The article was entitled, “Mr. Chiesa’s Brain: Can High-Tech Scans Prove That Criminal Acts are the Result of a Damaged Brain?”.
The appellant had three trial defense counsel working on his case, all of whom were aware of the appellant’s motorcycle accident four and a half months prior to the murders. Counsel were in possession of the appellant’s medical records pertaining to treatment following the accident and a pretrial sanity board report that briefly discussed the closed-head injury. Both sources reflected the appellant’s loss of consciousness at the time of the injury. The mitigation specialist obtained the damaged motorcycle helmet and gave it to trial defense counsel as a possible exhibit for trial. She further revealed to them the appellant’s roommate’s observations of a change in the appellant’s behavior following the motorcycle accident. The majority now takes exception to the accuracy of that assertion, but the relevance of this is not necessarily its accuracy, but the need to investigate further to determine its accuracy. *832 Part of her rationale for insisting defense counsel speak to Dr. FW and conduct additional testing was the fact that a change in personality may be indicative of a traumatic brain injury and if he suffered a traumatic brain injury that would assist in potentially explaining these horrific events perpetrated by the appellant. Given all of the evidence known at that point, even if the roommate’s observations were not accurate, there can certainly be no argument that the murder of two people, and nearly a third, was itself a marked departure from the usual character, personality, and behavior of the appellant.
At some point, the defense team asked Dr. BM about the mitigation specialist’s suggestion that additional testing and inquiry into the possibility of traumatic brain injury be conducted. He ultimately advised trial defense counsel that he saw no value to be gained by conducting further neuropsycho-logical testing. He opined that additional testing would not provide any more information than they already had and that the accident and concomitant injuries were not the source of the appellant’s behavior or an explanation for his actions. Counsel indicated that they “knew the [Government would likely fund whatever relevant expert or testing [they] requested.”
Despite the mitigation specialist’s insistence on consultation with a neuropsyehologist and completion of additional brain scanning, trial defense counsel did not consult with the recommended neuropsychologist, did not request additional brain imaging, and did not interview further witnesses with respect to the motorcycle accident. Instead, trial defense counsel assert that they did not continue investigation into this area because they relied upon the advice of a forensic psychologist consultant, who, in contradiction to the mitigation specialist, opined there was “no value to be gained by conducting further neuropsychological testing,” and “additional testing would not provide ... any more information than [they] already had.” They further characterize their decision not to present the known evidence of this motorcycle accident, closed-head injury, and subsequent behavioral changes as a “tactical decision.” Trial defense counsel reasoned that they “would lose credibility if [they] tried to make something of [the motorcycle accident] that the experts could not justify.”
Ultimately, the responsibility to investigate potential leads into mitigating evidence lies squarely on counsel. While counsel may and should, to a degree, rely on the expertise of their expert consultants, they may not delegate their decisions. “Only once either the expert or counsel has consulted all readily available sources can counsel’s reliance on the expert’s opinion be reasonable.” Wilson v. Sirmons, 536 F.3d 1064, 1089-90 (10th Cir.2008). Counsel must also consider all known facts and circumstances and must pursue all reasonable leads.
Trial defense counsel’s sole reliance on Dr. BM’s opinion was unreasonable for several reasons. First, counsel were faced with diverging opinions on the issue from two experienced experts. One, CP, had prior experience in dealing with traumatic brain injury at the sentencing phase and the presentation and impact of mitigation evidence such as this closed-head injury. The other trained in the field of psychology. I believe reasonable counsel would endeavor to resolve this dispute by simply picking up the phone and contacting Dr. FW with some basic level of inquiry. Second, while Dr. BM was a forensic psychologist who may have been qualified to perform some neuropsychological tests, he did not possess the same qualifications as Dr. FW as a neuropsychologist, and therefore it was not reasonable to rely on his opinion in an area outside of his area of expertise. Third, assuming arguendo it was reasonable to rely on Dr. BM’s advice preliminarily, such reliance is reasonable precisely until the moment it proves otherwise.
In this case, once it became obvious that there were significant problems with Dr. BM’s evaluation, scoring, and diagnosis of the appellant, such that his testimony became riddled with credibility issues and was no longer useful at trial, any reliance on his prior opinions became unreasonable and warranted immediate reevaluation. Once Dr. BM acknowledged his own inconsistencies and Dr. CR challenged the accuracy of Dr. BM’s analysis, trial defense counsel had a duty to reassess the case, their strategy, and *833 their anticipated presentation of evidence for the sentencing case. The situation was exacerbated with the decision not to use Dr. BM at all in sentencing. Dr. BM’s issues came to light during the Dauber t hearing on 26 September 2005. The presenteneing phase of the court-martial did not begin until 6 October 2005. Counsel never requested a continuance or delay, never attempted to secure a new forensic psychologist consultant, and there is no evidence they conducted any subsequent investigation into this known alternative explanation for the appellant’s behavior.
As for counsel’s fear of losing credibility by making something of the motorcycle accident that the experts could not justify, I have difficulty reconciling that with the decision not to investigate. It is unclear to me how counsel can make a deliberate decision not to investigate possible brain trauma from the motorcycle accident, then cite the very same lack of evidence of brain trauma to justify failing to present evidence of the undisputed motorcycle accident itself.
I find trial defense counsel’s performance unreasonable, as it falls below that of reasonably competent counsel. An analysis of counsel’s perspective at the time reveals a quantum of evidence, already known that would lead a reasonable attorney faced with the task of saving a client from the death penalty to investigate further. See Wiggins, 539 U.S. at 527, 123 S.Ct. 2527. Trial defense counsel chose to forego investigation into the possibility of traumatic brain injury, despite conflicting expert opinions, a Jack of any diagnosis yet that would provide explanation for the appellant’s aberrant behavior, independent information from appellate defense counsel highlighting the possibility of a correlation between a closed head injury and criminal acts, and noted behavioral changes in appellant following the accident, not the least of which were the murderous acts themselves.
Given the evidence outlined above, I find a reasonable attorney handling a death penalty case would have.investigated this issue further. In essence, there was no tactical or strategic decision not to pursue this lead; instead, there was simply a decision not to investigate because one of two experts, who later proved unreliable, felt the quest would be fruitless. Given the stakes in a death penalty case and the need to convince just one member that death is not warranted, I also find no reasonable tactical or strategic purpose for failing to present the known evidence of the motorcycle accident to the members. Even without expert testimony, the undisputed evidence of the accident was persuasive and relevant mitigating evidence about the appellant. Counsel’s lack of investigation falls short of providing effective assistance of counsel within the meaning under Strickland and the Sixth Amendment.[51]
The constraints placed on this potential lead were also unreasonable in light of what appellate defense counsel actually discovered and the ease with which this evidence could have been obtained. Had trial defense counsel simply contacted Dr. FW, as insisted upon by CP, they would have discovered the following: the sole CT scan done immediately after the accident could not exclude a traumatic brain injury because an immediate CT scan is mostly sensitive to acute bleeding rather than the longer term consequences of a traumatic brain injury; a review of Dr. BM’s testing results plainly suggested left hemisphere damage; the behavioral changes following the accident and the appellant’s uncharacteristic behavior on the night of the homicides are highly typical of the impairment in emotional self-regulation and impulse control that results from left anterior temporal lobe damage; even a mild traumatic brain injury can affect impulse control, normal cognitive functions, emotional self-regulation, and behavior; based on known evidence, Dr. FW would have expected proper scanning to show the appellant suffered from a traumatic brain injury; and, even without additional testing, Dr. FW could have given helpful and relevant testimony concerning the possibility of a traumatic brain injury in the appellant.

Mental Health Records of the Appellant’s Mother

The appellant also asserts that his trial defense counsel were ineffective when they *834 failed to investigate his mother’s mental health history and obtain his mother’s mental health records from an inpatient stay.
While the majority presents a very lengthy analysis of the post-trial issues involving the appellant’s mother’s mental health records, it appears their opinion is based on a lack of prejudice rather than an analysis of counsel’s performance. When trial defense counsel on the case intentionally forgo investigation into the area of a potential traumatic brain injury because they want to stay true to their theory of the case that appellant’s actions were directly influenced by his historical familial experiences, childhood, and the manner and environment in which he was raised, there seems to be no question that failure to obtain the records from the appellant’s mother’s inpatient stay was deficient.
The commentary to ABA Guideline 10.7 sets forth that family mental health history should be sought. This history was the trial defense team’s sole theory as to what caused appellant to commit these unspeakable acts. At least one of the trial defense counsel acknowledges, “[A]s part of the case theory rested on Dr. [BM]’s assessment of [MPj’s past mental health concerns ... we would have wanted these records.” However, none of the trial defense counsel presents any tactical, strategic, or other reason as to why investigation into this known lead was not pursued. In addressing the issue, civilian trial defense counsel states, “To the extent we did not seek [MPj’s mental health records, in my mind it was simply that Dr. [BM] did not ask us to obtain them. Had he done so, we would have had trial counsel obtain them.” This statement leaves the impression that trial defense counsel inappropriately attempted to delegate the decisions regarding diligent investigation to their expert. None of the trial defense counsel has offered any reasonable explanation for why the records, which were relevant to their stated theory of the ease, were not sought.
Counsel may not simply hire an expert and then abandon all further responsibility. Counsel ultimately has the obligation to perform as reasonably diligent counsel and to ensure adequate preparation and investigation for the sentencing phase. It is the attorney who bears the “responsibility to investigate and bring to the attention of mental health experts who are examining his client, facts that the experts do not request.” Wallace v. Stewart, 184 F.3d 1112, 1116 (9th Cir.1999).
Trial defense counsel’s lack of investigation in this area was constitutionally deficient. The appellant’s mother’s refusal to sign a consent form to obtain the records is irrelevant. Trial defense counsel’s duty is to their client, period. They knew of the appellant’s mother’s mental health history, the recommendation of the professional mitigation specialist to obtain the records, the theory of the ease propounded by their expert forensic psychologist, and the ABA Guidelines. The performance of counsel in failing to obtain these pertinent records or investigate this known lead of an inpatient mental health stay fell below the standards of competent counsel. Whether there is any prejudice as a result of this failure will be addressed below.

Evidence of Remorse

The third area I find meritorious is the appellant’s assertion that his trial defense counsel were ineffective for failing to investigate the potential remorse testimony of Deputy Sheriff LF. I agree with the majority that evaluation should focus on “ ‘counsel’s perspective at the time’ investigative decisions are made.” Rompilla, 545 U.S. at 381, 125 S.Ct. 2456 (citing Strickland, 466 U.S. at 689, 104 S.Ct. 2052).
There is no question that trial defense counsel desired to present remorse evidence in mitigation. The record reveals a concerted effort on the part of the prosecution to paint a picture of the appellant as lacking in remorse. Surely trial defense counsel were aware of this strategy, as they successfully avoided the live testimony of multiple witnesses by entering into stipulations of expected testimony. These witnesses all presented evidence of the appellant making social plans for 5 July 2004, the day following the murders.
Trial defense counsel has a fundamental duty to investigate evidence to rebut the Government’s potential aggravation evidence. See ABA Guideline 10.11. They simply failed *835 to follow up on this known lead and have offered no tactical or strategic reason why they failed to do so. Counsel concede the mitigation specialist recommended pursuing Deputy Sheriff LF as a potential witness and at least one counsel remembers asking her to obtain his contact information. He further acknowledges they “were very interested in presenting any evidence of remorse [they] could find, as well as evidence that showed [the appellant’s good conduct since his confinement. In [that counsel’s] opinion, Deputy [LF] could have been a good witness on both issues.” Civilian trial defense counsel’s affidavit expounds generalities about his lack of confidence in potential law enforcement witnesses. However, FS’s personal feelings about a witness he has never met and never spoken to provide no factual basis from which he could assess Deputy Sheriff LF’s potential as a witness or susceptibility to cross-examination.
Trial defense counsel failed to effectively investigate Deputy Sheriff LF as a potential mitigation witness. From the record, it appears that any decision not to interview him or call him as a witness was, at best, arbitrary. Counsel did not interview Deputy Sheriff LF, evaluate his potential testimony, observe his demeanor as a potential witness, or investigate possible impeachment material. I conclude that trial defense counsel’s uninformed strategic or tactical decision is not objectively reasonable and is constitutionally deficient.

Prejudice

Even if an attorney’s performance is deficient, an appellant is not entitled to relief unless “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 694, 104 S.Ct. 2052. When the deficient performance of counsel occurs during the sentencing phase, that requires the appellant to establish “a reasonable probability that a competent attorney, aware of [the available mitigating evidence], would have introduced it at sentencing,” and “that had the jury been confronted with this ... mitigating evidence, there is reasonable probability that it would have returned with a different sentence.” Wiggins, 539 U.S. at 535, 536, 123 S.Ct. 2527. “[A] defendant need not show that counsel’s deficient conduct more likely than not altered the outcome in the case.” Strickland, 466 U.S. at 693, 104 S.Ct. 2052 (emphasis added). .
The majority misapplies the Strickland standard in three ways. First, it addresses each of the alleged deficiencies raised by appellant and assesses its individual potential for prejudice in appellant’s sentencing case. This approach is contrary to that set forth in Strickland. The ultimate determination as to whether the prejudice prong of the Strickland test is met is based upon consideration of counsel’s errors as a whole, rather than individually. Strickland, 466 U.S. at 693-94, 104 S.Ct. 2052.
Second, the majority opinion aptly states that to assess prejudice, “we reweigh the evidence in aggravation against the totality of available mitigating evidence.” Wiggins, 539 U.S. at 534, 123 S.Ct. 2527. However, this “reweighing” was not intended to exclusively apply to the Gate Three analysis. True, to pass Gate Three in a military court-martial the members must unanimously vote that the mitigating circumstances are substantially outweighed by the aggravating circumstances. R.C.M. 1004(b)(4)(C); Loving, 47 M.J. at 442. It is also true that one way to show a reasonable probability of a different result would be for the appellant to establish that upon reweighing the evidence this balance would have been different. However, it is not the only way. The critical question is whether “there is a reasonable probability that at least one juror would have struck a different balance” in weighing the evidence for and against sentencing the defendant to death. Wiggins, 539 U.S. at 537, 123 S.Ct. 2527. This is a discretionary decision for each court member subject to no specific balance. This is the focus of Gate Four, largely unaddressed by the majority.
Third, the majority establishes a heightened standard of proof for the appellant inconsistent with Strickland. The majority is bogged down in the mire of a hypothetical battle of the experts as to whether or not *836 the appellant can prove he suffered a traumatic brain injury as if that is a legal prerequisite to prevailing on the prejudice prong of Strickland. At some point, the majority opinion essentially equates prejudice to proof that the appellant actually suffered a traumatic brain injury. The opinion undertakes to rescript the sentencing case with its own rendition of how such testimony might have been presented and rebutted and ultimately concludes that unless appellant can present evidence on appeal that he in fact suffered a traumatic brain injury and that such injury in fact influenced his behavior, then he cannot establish a reasonable probability of a different outcome. In several places, the majority suggests that the omitted evidence could not be mitigating such to affect the appellant’s moral culpability unless he could affirmatively establish a traumatic brain injury that influenced his behavior and excused his conduct. I disagree with the heightening of a standard that does not exist in Strickland. Instead, Strickland requires us to look at the all of the evidence presented on appeal, both good and bad, Wong v. Belmontes, 558 U.S. 15, 26, 130 S.Ct. 383, 175 L.Ed.2d 328 (2009), and determine whether there is a reasonable probability that just one court member would have voted against death, thereby changing the outcome. Strickland, 466 U.S. at 694, 104 S.Ct. 2052. The focus should be on Gate Four of a death penalty sentencing hearing. At this stage of the sentencing decision, there are no elements to meet, no standards of proof, no burden of persuasion required, just the absolute discretion of the court members to consider all facets of the crime and the individual characteristics of this person who committed it to render the ultimate decision as to whether he is sentenced to death or not. R.C.M. 1006(d)(4)(A). It is with that in mind, that the Strickland standard on prejudice must be analyzed.
Our role is not to determine whether prejudice existed such as to excuse the appellant’s actions; that would be a findings issue. In Hodge v. Kentucky, Justice Sotomayor, dissenting from a denial of certiorari, wrote that the Kentucky Supreme Court “misunderstood the purpose of mitigation evidence” when it “reasoned that Hodge’s mitigation evidence might have altered the jury’s l’ec-ommendation only if it ‘explained’ or provided some ‘rationale’ for his conduct.” — U.S. -, 133 S.Ct. 506, 509, 184 L.Ed.2d 514 (2012) (Sotomayor, J., dissenting from denial of certiorari). Justice Sotomayor went on to state, “We have made clear for over 30 years, however, that mitigation does not play so limited a role.” Id. (citing Lockett v. Ohio, 438 U.S. 586, 604, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Eddings v. Oklahoma, 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Abdul-Kabir v. Quarterman, 550 U.S. 233, 252, 127 S.Ct. 1654, 167 L.Ed.2d 585 (2007)). As in Hodge, the omitted evidence due to counsel’s errors need not have offered any “rationale” for the murders in order for the panel to have considered it as weighty mitigation. Id. at 510. It would be enough if there were a “reasonable probability” that, because of the appellant’s closed-head injury and signs of remorse, the members’ “reasoned moral response” would instead have been to spare his life and sentence him to life imprisonment instead of death. Id. at 510.
There is no question that the facts of this crime are gruesome. Two people, and nearly a third, died at the hands of a fellow Airman who by all accounts was their friend. The evidence presented during the findings case offered little explanation and weak motive for these horrible acts. The aggravation case consisted of the very facts of the crime that made this case “death-eligible,” the impact on the victims and their surviving family members, evidence that the appellant demonstrated a lack of remorse following the murders, and with no other explanation for the acts, an argument that the appellant was simply “evil.” The majority opinion expounds on the details of this presentation.
What was lacking in the aggravation case was any evidence that the appellant had a prior history for violence. In fact, he had no criminal history at all; no administrative discipline of any kind. Moreover, there was no evidence whatsoever to deduce that the appellant had a propensity for future violence.
*837 The mitigation case presented included character letters and testimony from friends, teachers, religious leaders, and family members who all described the appellant as a well-mannered, respectful youth, who never caused any trouble. While there was ample testimony regarding his mother’s troubled upbringing, there was no nexus of this turmoil to the appellant’s life. Other than his knowledge of his parent’s divorce and his mother’s brief inpatient stay for mental health issues, there was little, if any, evidence to indicate he was even aware of his mother’s issues. All in all, the extenuation and mitigation case as presented was benign.
In this ease, there were three trial defense attorneys, none of whom had ever handled a capital case before. While our superior court has declined to mandate compliance with the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, United States v. Loving, 41 M.J. 213, 300 (C.A.A.F.1994), the guidelines exist for a reason. They exist because of the finality of death and simple fact that the presentation of a case in extenuation and mitigation is different from any other aspect of litigation; it is different from a findings ease, and it is different from a standard sentencing case.
In any other type of litigation, a counsel’s job is to appeal to the jurors, whether unanimously or by majority, to render a decision in favor of their client’s position. Completely contrary to this is the unique and sole objective for defense counsel in a death penalty case — to present a case filled with relevant and persuasive mitigating and extenuating evidence with the distinctive goal of reaching just a single court member who will employ his or her unfettered discretion at the Fourth Gate and deny a vote for death, thereby sparing the life of their client. Because of the inimitable backgrounds, experiences, and convictions of court members, the mitigation specialist, CP, appears to have been advising defense counsel of the critical need to present all of this evidence in hopes of appealing to that one court member rather than selecting a single theory in sentencing. This is an aspect of capital litigation unfamiliar to defense counsel in this case[52] and a point of consternation between him and his learned advisor. For this reason, I concur with the opinions of Judge Mitchell and Judge Pelo-quin advocating for minimum qualifications for death penalty counsel in the military. The failure to recognize CP’s expertise in this area led counsel to make the investigative decisions that I find constitutionally deficient.
While I find that counsel was deficient in failing to obtain appellant’s mother’s mental health records, I readily point out that the majority of the information contained therein was indeed cumulative and presented to the members through witness testimony. Unfortunately, it was not appellant’s mother on trial, so the weight to be placed on the evidence of her upbringing could only be established by its impact on the appellant’s life. One potential connection to the appellant was her Axis II diagnosis that was discovered in the missing mental health records — the same Axis II diagnosis established by Dr. BM for appellant independent of that knowledge. That being said, one may be curious as to how that information and like-diagnosis may have impacted Dr. BM’s overall case presentation and reliability, but given the extreme speculative nature of such, I find it adds very little to the overall assessment of prejudice.
Given the Government’s concerted effort at showing the appellant’s lack of remorse, it was necessary to rebut such evidence with *838 the best evidence at trial defense counsel’s disposal. The lack of investigation into Deputy Sheriff LF’s potential testimony left their arsenal wanting of such remorse evidence. Of the 15 defense witnesses, only three presented any remorse evidence. The first was Ms. SF, who testified that she had received approximately six letters from the appellant while he was in custody and that they conveyed “a tone of remorse.” However, she was extensively cross-examined on specific passages from those letters that were not expressive of remorse and the letters were ultimately introduced into evidence by the Government. The second witness was Mr. RJ, a former employer of the appellant, who testified that he received one letter from the appellant and believed “he was remorseful of what he has had [sic] done.” Finally, the appellant’s father testified that in phone calls with the appellant, “he was so full of guilt and remorse, self-loathing that it took all my strength [voice shaking] sometimes to get him up and maybe make him laugh. Some of the phone calls were so exhausting that I would actually spend the next day in bed. They were just so painful.” Only one of the numerous character letters admitted by the defense at sentencing reflected a showing of remorse by the appellant. In addition to this evidence, the appellant expressed his remorse both in his oral and written unsworn statements.
Had Deputy Sheriff LF been contacted, the defense would have learned the content of his testimony. His written declaration submitted on appeal does not just express a conclusion that the appellant was remorseful but paints a powerful image of a young man broken down by remorse.
Deputy Sheriff [LF]’s declaration contains, in part, the following passages:
3. During this Article 32 hearing, I witnessed [the appellant] overcome by emotion. When the. prosecution presented its evidence against [the appellant], he broke down and sobbed uncontrollably. This happened, in particular, when crime scene photos were displayed. I saw a broken young man, in great pain and despair. He was so emotionally overcome that he had to excuse himself from the hearing.
4. I accompanied [the appellant] to another part of the courthouse while the hearing continued. He continued to display sadness and great emotion. I took it upon myself to give him comfort and spiritual guidance. I wrapped my arms around him to give him a hug. I whispered words of encouragement to him in hopes of consoling him. I wanted him to know that he was walking with God. I told [the appellant] that God loved him and that I loved him. I interpreted [the appellant’s] emotion to be genuine and sincere. I would not have approached him otherwise. I believe he was remorseful for what he had done.
8. If I had been asked to testify on behalf of [the appellant], I would have done so. I would have told the court-martial about my interaction with him during his Article 32 hearing, our spiritual discussion, and my observations of his emotion and remorse. In my experience in law enforcement, I have dealt with numerous murderers, rapists, and other violent criminals. I have never testified on behalf of any of them. Only one other time did I observe the emotion and remorse, and sincerity of such, like I did of [the appellant] in another defendant.
9. However, I never spoke to any of [the appellant]’s attorneys.
None of the other remorse evidence presented came close to the picture painted by Deputy Sheriff LF as evidenced by his post-trial declaration. Furthermore, the record reveals the panel’s keen interest in the appellant’s remorse as a court member presented questions to Mr. RJ about the remorse he gleaned from the appellant’s letter.[53] Given *839 a strong focus of the Government’s sentencing case was the appellant’s lack of remorse, the interest in the appellant’s level of remorse demonstrated via the court member’s question, and the limited amount of remorse evidence presented by the defense, Deputy Sheriff LF’s testimony would have presented an unbiased and new perspective on the issue otherwise absent from the appellant’s mitigation case.
Above all else, the failure to investigate the possibility of a traumatic brain injury and failure to present evidence of the same is undeniably prejudicial. Even the basic fact of a closed-head injury resulting from a motorcycle accident four and a half months pri- or to the murders is sufficient to cause a reasonable juror to pause and question whether such injury could offer an otherwise wanting explanation for these acts or given the members new medical information to consider in evaluating whether death is an appropriate sentence. Counsel’s deficient approach of not exploring the leads with respect to the possibility of a traumatic brain injury was amplified by the lack of any other mitigation or extenuation evidence that may have shed light on motive or why this aberrant behavior transpired. After Dr. BM was rendered unavailable and Dr. CR’s independent evaluation revealed nothing helpful to the appellant’s strategy in sentencing, the defense was “left without what [they] had viewed would be helpful psychological testimony and forced to rely entirely upon evidence from [the appellant’s friends and family.” This loss of psychological testimony rendered the defense strategy hollow and ineffective against the Government’s argument that these crimes were committed because the appellant is evil and some people are just bad.
The affidavit of Dr. FW sheds light on the possibility of a traumatic brain injury. Of course, we would expect cross-examination and evidence to the contrary had it been presented, but such cross-examination would simply have left the matter before the court members to assess credibility between the experts and to individually decide how much weight to give the evidence. Cross-examination and an opposing expert view does not preclude the reasonable probability that just one juror would weigh this evidence of a closed-head injury and possibility of a traumatic brain injury and find the appellant’s moral culpability reduced just enough to deny the death penalty when asked to vote.
Courts have repeatedly found evidence of mental problems, arguably including the effects of traumatic brain injury, to be powerful mitigation. “[EJvidence about the defendant’s background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to ... emotional and mental problems, may be less culpable than defendants who have no such excuse.” Penry v. Lynaugh, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (quoting California v. Brown, 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O’Connor, J., concurring)), abrogated on other grounds by Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); see also Allen v. Woodford, 395 F.3d 979, 1006 (9th Cir.2005) (noting that “explanatory” mitigating evidence often bears more weight than “humanizing” evidence); Cannon v. Gibson, 259 F.3d 1253, 1277-78 (10th Cir.2001) (finding omitted mitigation information of “serious brain damage” and lack of impulse control would have displaced mitigation information portraying the petitioner as a “kind, compliant, and responsible individual whose involvement in the murder was an aberration”). Yet, as highlighted by Hodge, 133 S.Ct. at 509, mitigation evidence is not limited to evidence that may explain behavior; it may also include relevant factual information about this appellant’s recent medical history.
In Caldwell v. Mississippi 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the Supreme Court overturned a capital sentence as inadequately reliable because of a statement made by the prosecutor during the closing argument of the sentencing phase of the trial. In reaching that conclusion, the Court observed that capital sentencing jurors, required to determine “whether a specific human being should die at the hands of *840 the State,” Id. at 329, 105 S.Ct. 2633, are “placed in a very unfamiliar situation and called on to make a very difficult and uncomfortable choice.” Id. at 333, 105 S.Ct. 2633. Such court members, called upon to make this extremely weighty decision, might reasonably find any one of a variety of mitigating or-extenuating circumstances significant enough to cau'se them to decline to vote for the ultimate determination of death for this specific human being.
The “truly awesome responsibility” imposed upon capital sentencing juries cannot be taken for granted. McGautha v. California, 402 U.S. 183, 208, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), reh’g granted, judgment vacated sub nom. Crampton v. Ohio, 408 U.S. 941, 92 S.Ct. 2873, 33 L.Ed.2d 765 (1972). The sentence in this case is simply not reliable due to the substandard performance of trial defense counsel and the prejudice to the appellant directly caused by the lacking evidence in mitigation and extenuation that should have been investigated and ultimately presented to the court members. The undiscovered and absent mitigating evidence, taken as a whole, “might well have influenced the jury’s appraisal” of the appellant’s moral culpability. Wiggins, 539 U.S. at 538, 123 S.Ct. 2527 (quoting Williams, 529 U.S. at 398, 120 S.Ct. 1495).
The death sentence handed down at trial in this case did not come easy. It was far from a quick and obvious decision. The members deliberated for nearly twelve hours over a three-day period before reaching them death sentence. With that in mind, the probability is indeed reasonable that any one member might have embraced the uninvestigated and omitted mitigating evidence regarding an undisputed recent motorcycle accident, the undisputed concomitant closed-head injury, and expert testimony supporting the simple possibility of a traumatic brain injury. Coupled with the emotionally impactful, yet missing, remorse evidence Deputy Sheriff LF could have supplied to rebut the prosecution’s argument the appellant felt no remorse, I find the existence of a reasonable probability, sufficient to undermine the confidence in the outcome of this case. There is ample evidence to establish prejudice — that just one member would hear it all and decide against death.
Having found both constitutionally deficient performance as well as prejudice, I would reverse the sentence in this case and remand for a new sentencing hearing.

. U.S. Const, amend. VIII.

. U.S. Const, amend. VI.

. While I recognize FS may have extensive experience in litigating cases before military members, his affidavit is illustrative of his frustration with CP's perspective and the lack of value he placed in her experience dealing exclusively with death penalty cases:
[lit must be noted that while I valued [CP]’s work and input, I felt that she did not fully appreciate the unique challenges of defending military cases with members senior in rank to the accused as opposed to trying a case before a civilian jury. I spent most of my entire professional life defending military cases in front of members. My approach is to be focused in presenting a defense or a sentencing case. In other words, I do not as a rule call marginal witnesses or raise marginal issues before members. In my opinion there is too much risk they will ultimately hurt your case. [CP] seemed to be more willing to throw everything against the wall and hope that at least one member would respond....

. The court member probed the issue of remorse as follows:
Q. Okay. You indicated that you believed from the tone of [the appellant’s letter that he was remorseful. What was it about the tone of that letter that — first off, let me ask you, did he actually say that he was remorseful?
A. No, he did not.
Q. Okay. But it’s from the tone of the letter, the entire letter, that gave you that appreciation of your belief that he was remorseful?
*839 A. Yes, it did.